UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | Criminal Action |
| v. | ) | No. 3:23-cr-30016-BEM |
| BAIRON UBEDA, | ) | Pages 1 to 118 |
| Defendant. | ) | |

BEFORE THE HONORABLE BRIAN E. MURPHY
UNITED STATES DISTRICT JUDGE

JURY TRIAL
** EXCERPT **
TESTIMONY OF ALEXANDRIA CHURCH

August 19, 2025
10:00 a.m.

United States Courthouse
300 State Street, Suite 120
Springfield, Massachusetts 01105
Hamden Courtroom

Jessica Leonard, CSR, FCRR
Official Court Reporter
United States District Court of Massachusetts
595 Main Street
Worcester, MA 01608
Jessica@wickedsteno.com

APPEARANCES:

On Behalf of the Government:

UNITED STATES ATTORNEY'S OFFICE
By: Lauren Maynard
1 Courthouse Way
Suite 9200
Boston, MA 02210
617-748-3319
Lauren.maynard@usdoj.gov

UNITED STATES ATTORNEY'S OFFICE
By: Mark J. Grady
One Courthouse Way
Boston, MA 02210
617-748-3100
Mark.grady@usdoj.gov

On Behalf of the Defendant:

SASSON TURNBULL RYAN & HOOSE
By: Luke F. Ryan
100 Main Street, 3rd Flr.
Northampton, MA 01060
413-586-4800
Lryan@strhlaw.com

**STENOGRAPHER'S NOTE:** All quotations from exhibits or other documents are transcribed as they were read into the record and do not necessarily reflect the exact wording of the original document.

Quotation marks in the transcript are used for readability and stylistic purposes and may not represent a direct quote.

Proceedings reported and produced by computer-aided stenography.

# I N D E X

| | |
|---|---|
| | PAGE |
| WITNESSES: | |
| **ALEXANDRIA CHURCH** | |
| DIRECT EXAMINATION BY ATTORNEY MAYNARD | 4 |
| CROSS-EXAMINATION BY ATTORNEY RYAN | 73 |
| REDIRECT EXAMINATION ATTORNEY MAYNARD | 114 |

**P R O C E E D I N G S**

ALEXANDRIA CHURCH,

having been duly sworn by the Clerk, was questioned and testified as follows:

THE CLERK: Please be seated and state your full name and please spell your last name.

THE WITNESS: Alexandria Church, last name spelled C-H-U-R-C-H.

THE COURT: You may examine.

DIRECT EXAMINATION

BY ATTORNEY MAYNARD:

Q. Good morning Ms. Church.

How old are you?

A. 31.

Q. And where do you currently live?

A. Hartford, Connecticut.

Q. How long have you lived in Hartford?

A. Going on about three to four years.

Q. And, Ms. Church, where did you grow up?

A. I grew up in Springfield, Massachusetts.

Q. And about how long did you live in Springfield?

A. Mostly my whole life.

Q. Do you have any children?

A. Yes, I do.

Q. How many?

A. I have one. I have a son.
Q. How old is he?
A. He will be turning 10 in September.
Q. I want to direct your attention to December of 2018?
A. Okay.
Q. Where did you live in December of 2018?
A. I was staying in Virginia.
Q. What part of Virginia, if you remember?
A. No, I don't.
Q. And do you remember about when you moved there?
A. Around the end of December; around Christmas time.
Q. And about how long did you stay there?
A. About a week or two.
Q. And when you were in Virginia, who were you living with?
A. I was living with a couple of friends and some family members of theirs.
Q. Who else lived with you there?
A. My son as well was living with me.
Q. At that time -- so December, 2018, early January, 2019 -- did you have a Facebook account?
A. Yes, I did.

ATTORNEY MAYNARD: Ms. Minster, if we can move to the other computer for a second and show Exhibit 1-1 just for the witness. It's showing up on these screens, too.

THE COURT: The jury should not see it.

BY ATTORNEY MAYNARD:
Q. Can you see what's in front of you?
A. Yes.
Q. And do you recognize that?
ATTORNEY MAYNARD: We may need to scroll down a bit, Ms. Minster.
THE WITNESS: Yes, I do.
BY ATTORNEY MAYNARD:
Q. And have you had a chance to review this document before today?
A. Yes.
Q. And what is that document?
A. Messages from my Facebook to another woman.
ATTORNEY MAYNARD: And Ms. Minster, we can take that down and switch to the other computer.
THE CLERK: Am I showing it to everyone?
ATTORNEY MAYNARD: Yes.
THE CLERK: I don't think she controls that. I do.
ATTORNEY MAYNARD: Okay.
And can we see Exhibit 1-2?
BY ATTORNEY MAYNARD:
Q. Ms. Church, looking at this document in front of you, is this a redacted version of the document you were just looking at?
A. Yes.

Q. Looking at the bottom of this page --

ATTORNEY MAYNARD: And, Ms. Minster, can you blow up the bottom message?

BY ATTORNEY MAYNARD:

Q. This is from Sandra E. Vazquez Facebook account and what does this message say?

A. It says, "Say hi to your new Facebook friend Alexandria."

Q. Do you remember -- the date on this is December 31, 2018. Do you remember in December, 2018 receiving a friend request from a Sandra Vazquez Facebook account?

A. Yes.

Q. Did you accept that friend request?

A. Yes, I did.

Q. And did that Sandra Vazquez Facebook account begin sending you messages after that?

A. Yes.

ATTORNEY MAYNARD: If we can go to page 2 of this Exhibit. And if we can blow up the message at 15:21:07.

BY ATTORNEY MAYNARD:

Q. What does this Sandra Vazquez Facebook account say to you here?

A. It says, "Do you mind if I ask you how old are you? How are you doing financially, my love? Ever done any adult modeling before? The reason why I ask because again you sure look very beautiful and indeed have an amazing sexy body."

THE COURT: Ms. Maynard, can I get you to pause. I think we're having a little trouble. Does that work any better?

Okay, thank you.

ATTORNEY MAYNARD: After this message, if we can look below that. At the bottom of the page that says "The Sandra Vazquez account sent a photo." And Ms. Minster, if we can scroll through the next couple of pages ending on page 6.

BY ATTORNEY MAYNARD:

Q. Do you recognize those photos that we just saw?

A. Yes.

Q. Were those photos that were sent to you from the Sandra Vazquez account?

A. Yes, they were.

Q. And looking at the top message on this page, how did you respond after receiving these photos?

A. I'm 24 and I'm doing okay, getting by with my three-year-old. And thank you. You have an amazing body as well, mama."

Q. And below that it says, "Alexandria sent six photos." Did you send photos to the Sandra Vazquez Facebook account?

A. Yes, I did.

ATTORNEY MAYNARD: Ms. Minster, if we can scroll through those next pictures and stop on page 16.

BY ATTORNEY MAYNARD:

Q. Ms. Church, do you recognize those photos that we just saw?
A. Yes, I do.
Q. What were those photos?
A. Pictures of myself.
Q. Did you send those to the Sandra Vazquez Facebook account?
A. Yes, I did.
Q. Why did you send those pictures of yourself?
A. It was for the job that she was offering to me.
Q. And what job are you talking about?
A. It was an adult modeling job.
ATTORNEY MAYNARD: We can go to page 21. And if we can look at that message at timestamp 15:28:53.
BY ATTORNEY MAYNARD:
Q. Ms. Church, what does the Sandra Vazquez account say to you here?
A. It says, "The more I keep looking at the photos you sent me, the more I would wanna tell my boss about you and e-mail him ASAP. You have such a sexy body, age, and sexy smile."
Q. So when the Sandra account said, "I want to tell my boss about you," what did you understand her to be talking about?
A. The boss that runs the company for the modeling.
ATTORNEY MAYNARD: If we can go to page 22. And can we blow up that middle message, 15:36:52?
BY ATTORNEY MAYNARD:

Q. Ms. Church, can you read what the Sandra Vazquez account sent to you here?
A. It says, "I do adult XXX sexual entertainment modeling but now I'm also the co-hiring director and operations president for my boss' company. My boss's company are Naughty Fantaziez, Adult, Inc. and Creative Fantaziez XXX, Inc.
"This type of money-making opportunity is kept and done at the maximum discreet and private level. For us, females' reputation and privacy is our number one priority. We only do outside the USA marketing and sales, meaning nothing gets shown in the U.S.
"Even some new females don't have the experience in the adult XXX sexual entertainment industry. Once they pass some tests, challenges, auditions, and casting and they become officially hired, they will start between $6,100 and $9,450 every week for the first three months."
Q. And looking below that, and how did you respond to that message?
A. I answered, "Damn."
Q. And why did you respond that way?
A. Because it's a lot of money for a company that does adult modeling.
Q. Now if we can look at the message below that. What did the Sandra account say back to you?
A. "The difference on what we do is everything is 101 percent

private and the remaining 101 percent discreet. We only do business in the international market such as Libya, Syria, Pakistan, Ireland, Brazil, and Mumbai.

"These countries usually prohibit these females to do any such thing like this, but yet men sure love to see anything that has to do with adult modeling; so the market there is so high and that's why they buy it and pay top money because it's coming from the United States.

"And yes everything goes outside of the United States my love."

ATTORNEY MAYNARD: And the next page.

BY ATTORNEY MAYNARD:

Q. So that message continues and then you respond to it. If you can read the rest of that message.

A. "The only way any candidate's family and/or friends would see any videos and any photos of her while working for my boss is if the candidate herself tells them and shows them her work. Other than that, over 13 years my boss has owned the company and females' privacy and reputation is his number-one priority.

"Once a female completes the pre-qualification process, which includes passing an EB background check and submitting a minimum of 15 recent full-body photos of her, she will get scheduled to start some tryouts, auditions, as well as some casting for some new projects we are starting.

"There are only three open positions available to hire.

Once filled, we will not be looking for females until September of 2019. Once officially hired, every model gets her nails, hair, and makeup done every single week and we pay for that. Also a $350 Victoria's secret gift card is given every week so females can buy their panties, thongs, et cetera, from there."

Q. So based on that message, what did you understand you would need to do to get this job?

A. I would need to send them photos of myself.

Q. And how did you respond?

A. I put, "Sounds amazing."

Q. Why did you think it sounded amazing?

A. Because they pay for stuff for the girls to have done and they were willing to help me financially.

ATTORNEY MAYNARD: If we can look at the bottom of page 24.

BY ATTORNEY MAYNARD:

Q. And it says, "The Sandra account sent a photo." Do you see that?

A. Yes.

ATTORNEY MAYNARD: Ms. Minster, if we can scroll through the next pages ending on page 28 and look at those photos.

BY ATTORNEY MAYNARD:

Q. Ms. Church, do you recognize those photos that we just saw?

A. Yes.
Q. What were they of?
A. They were photos of money.
Q. And those were sent to you from the Sandra Vazquez account?
A. Yes, they were.
Q. Why did you think the Sandra Vazquez account was sending you pictures of money?
A. To get me into wanting to work for the company.
Q. Did it make you want to work for the company?
A. Yes.
ATTORNEY MAYNARD: If we can go to page 31 and look at the message beginning at 15:51:16 and the next two below that.
BY ATTORNEY MAYNARD:
Q. Ms. Church, can you read what the Sandra Vazquez account sends to you here?
A. "I so wanna e-mail my boss and not only have him see your photos but I so love your personality and would want him to give you an opportunity."
Q. And how did you respond?
A. "I have more that was my one from Snapchat."
Q. And what did the Sandra Vazquez account say?
A. "Don't be shy and text him ASAP, mama. Go ahead and introduce yourself much more about you without being shy."
ATTORNEY MAYNARD: Ms. Minster, can we see what's

below that in that message?

BY ATTORNEY MAYNARD:

Q. So at the bottom of that message, what did the Sandra Vazquez account send to you?

A. She sent me a phone number, "Mr. Raymond G., founder, CEO, president, and then Naughty Nurse Adult XXX, Inc."

Q. So who did you understand Mr. Raymond G. to be based on this message?

A. The boss.

Q. And this message is sent at 15:55:13.

ATTORNEY MAYNARD: If we can look at the message below that. And the next three messages, actually.

BY ATTORNEY MAYNARD:

Q. So at 16:00:36, that's about five minutes later, what does the Sandra Vazquez account say to you?

A. "You okay, mama?"

Q. And then what?

A. "I stopped hearing from you."

Q. And how did you respond?

A. "I'm fine, I was in the middle of taking care of my son real quick."

ATTORNEY MAYNARD: If we can go to page 41.

BY ATTORNEY MAYNARD:

Q. And this is on this same date, December 31, 2018, at 16:16:55. It says, "Alexandria sent 12 photos." Did you send

additional photos to the Sandra Vazquez account?
A. Yes, I did.
ATTORNEY MAYNARD: Ms. Minster, if we can go through those pictures and stop at page 67.
(The pictures were shown.)
BY ATTORNEY MAYNARD:
Q. Ms. Church, do you recognize those photos that we just reviewed?
A. Yes.
Q. What were they?
A. They were photos of myself.
Q. Did you take those?
A. Yes, I did.
Q. Did you send them to the Sandra Vazquez Facebook account?
A. Yes, I did.
Q. Why did you do that?
A. To give them pictures of myself for the job that I was pretty much planning to do.
Q. Now, on this page, do you see where it says the Sandra account sent seven photos?
A. Yes.
ATTORNEY MAYNARD: Ms. Minster, if we can scroll through those and then end on page 93.
(The pictures were shown.)
BY ATTORNEY MAYNARD:

Q. Ms. Church, do you recognize those photos that we just reviewed?
A. Yes, I do.
Q. What were those?
A. Those were photos that Sandra E. Vazquez sent to me.
ATTORNEY MAYNARD: If we can look at the top message on this page 93.
BY ATTORNEY MAYNARD:
Q. What did the Sandra Vazquez account say to you after sending those photos?
A. "Those were samples of some recent candidates who submitted their required photos. They gotta be a minimum of 20 sexual XXX full body photos of themselves without covering their face and without being shy."
Q. So based on those messages, what did you understand the reason to be for the Sandra account sending you those photos?
A. To show me an idea of what to send to them.
Q. And can we look at that second message as well? What did the Sandra account say to you here?
A. "And due to privacy and strict rules, I have covered their identity, that's why you see blurred in their faces, so I can show you some samples and give you ideas."
ATTORNEY MAYNARD: If we can go to page 135.
BY ATTORNEY MAYNARD:
Q. At the bottom of this page, do you see where the Sandra

account sent a photo?
A. Yes.
ATTORNEY MAYNARD: And, Ms. Minster, if we can scroll through the next photos ending at page 140.
BY ATTORNEY MAYNARD:
Q. Ms. Church, did you recognize those photos that we just reviewed?
A. Yes, I do.
Q. What were they?
A. They were photos that Sandra E. Vazquez sent to me.
Q. Did the Sandra account -- what did the Sandra account say to you about those pictures that we just saw, if anything?
A. They were provocative and it was showing stuff about having sex -- showing sex.
ATTORNEY MAYNARD: Can we go to page 153? And just blow up that message, please.
BY ATTORNEY MAYNARD:
Q. What does the Sandra account say to you here?
A. She put, "Full legal name. Full date of birth. Current home address. Phone number. Social security card. License/ID number and expiration date. Current employer name. Phone number and address. Tattoos if any. Piercings if any."
Q. Why did you think the Sandra account was sending you that list?
A. It was information to apply to the job.

Q. Information for you to provide?
A. Yes?
Q. And if we look, I think, at the bottom of this page it shows that you sent a response, the beginning of the response. What did you provide there?
A. My first and last name and my date of birth.
Q. And then on the next page, what else did you provide?
A. I sent my address where I was living, my phone number, my social security card, what I was doing -- which is a stay-at-home mom -- my ID and expiration date, tattoos on my left arm, and my ears were pierced.
Q. Why did you send that personal information to the Sandra Vazquez account?
A. It was the information they had asked for the job that I was applying to.
Q. Why did you think they needed that information for a job application?
A. For any job you apply for, you have to give them your first and last name and two forms of ID and other information.
Q. So you thought it was reasonable to send that information?
A. Yes.
ATTORNEY MAYNARD: We can go to page 156.
BY ATTORNEY MAYNARD:
Q. And if we can look at the message beginning at timestamp 17:26:05 and the three messages there. What does the Sandra

Vazquez account say to you here?
A. "Meantime, I need clear photos of your documents."
Q. How did you respond?
A. I put "okay."
Q. And then what did the Sandra account say?
A. "License or ID, social securities card, birth certificate, and any official mail with your current address."
Q. And if we look at the bottom of that page, do you see that it says "Alexandria sent a photo"?
A. Yes.
ATTORNEY MAYNARD: Can we go to the next page?
BY ATTORNEY MAYNARD:
Q. What is this a photo of?
A. That was a photo of my ID.
Q. Why did you take that photo?
A. They had asked for pictures of my documentation.
Q. And did you send it to the Sandra Vazquez account?
A. Yes, I did.
ATTORNEY MAYNARD: Can we go to page 159?
BY ATTORNEY MAYNARD:
Q. What is that a photo of?
A. That is a photo of my social security card.
Q. Did you take that?
A. Yes, I did.
Q. And what did you do with it?

A. I sent it to the Sandra E. Vazquez account.

ATTORNEY MAYNARD: And can we go to page 163?

BY ATTORNEY MAYNARD:

Q. What is this a photo of?

A. That is a photo of my birth certificate.

Q. Did you take that one, too?

A. Yes, I did.

Q. And what did you do with it?

A. I sent it to the Sandra E. Vazquez account.

Q. Why did you send photos of those documents to the Sandra Vazquez Facebook account?

A. She had asked for clear pictures of my documentations for the job?

ATTORNEY MAYNARD: If we can go to page 164 and look at the bottom two messages.

BY ATTORNEY MAYNARD:

Q. What does the Sandra Vazquez account -- and just for the record, we're now looking at messages on January 1, 2019, and this first one is timestamped 02:02:00 UTC.

What does the Sandra Vazquez account say to you here?

A. "My boss wants you to text him ASAP."

Q. How did you respond?

A. I put "okay."

ATTORNEY MAYNARD: If we can go to the next page. The first four messages.

BY ATTORNEY MAYNARD:
Q. What did the Sandra account say to you?
A. "Let me know when I can send you some HD XXX photos, mama."
Q. How did you respond?
A. "Whenever you want." And I just texted him.
Q. And what did the Sandra account say?
A. "Did you really, though?"
Q. And then what?
A. "Hopefully he won't be too busy to reply back."
Q. And if we can look at the rest of the messages on this page. Then what did you say?
A. "Yes, I literally just texted him."
Q. Then what did the Sandra account say?
A. "What you think of some of the XXX sex sketches I've shown you earlier? My boss has done those so he can have some ideas on how he wants to test and try out some of our new candidates."
Q. Then what did you say?
A. I loved them; they were fine.
Q. And those XXX sex sketches that the Sandra account referenced, did you understand that to be those sketch-like photos that we saw earlier?
A. Yes.
Q. And at the bottom of this page, do you see that it says,

"the Sandra account sent a photo"?
A. Yes.
ATTORNEY MAYNARD: And, Ms. Minster, if we can scroll through the next pages ending at page 169.
BY ATTORNEY MAYNARD:
Q. Did you recognize those photos we just saw?
A. Yes.
Q. Those were other images that Sandra E. Vazquez sent to me.
ATTORNEY MAYNARD: And if we can look at the messages beginning at 17:51:57, the four messages there. And this is now January 2, 2019, the timestamp is 17:51:57 UTC.
BY ATTORNEY MAYNARD:
Q. What does the Sandra account say to you here?
A. She put all in caps, "Um, so you don't have good service there? Okay, baby girl."
Q. Then what did you say?
A. "Yeah, I texted him exactly what he asked me and anything he threw at me I answered."
Q. And then what?
A. "The last thing I texted him was about the picture he sent me and then I didn't hear from him."
Q. Then what did the Sandra account say?
A. All in caps she put, "that's cuz he got very disappointed the fact that not only you were taking so long to reply but you weren't giving him all your time."

Q. So why did you -- based on these messages, did you understand that the boss or the Sandra account was angry with you?
A. Yes.
Q. Why?
A. Because the messages went from lower case to all cap.
Q. And why were they mad at you?
A. Because I wasn't giving them -- all of my attention to them.
ATTORNEY MAYNARD: Can we go to page 171? And starting at the message timestamped 18:09:33, if we can look at the rest of the messages on that page.
BY ATTORNEY MAYNARD:
Q. What does the Sandra account say to you here?
A. In all caps, "I need you to start looking for slutty sexy outfits that you could pull together. For each outfit, I need you to take five to six and then change to another slutty outfit, so on and so on."
Q. And then what?
A. "Different panties, et cetera. Be very sexual in each photo with different slutty outfits, et cetera. Be very creative, mama."
Q. And then what?
A. "Try not to see if you could take the photos in your room so bright lights from outside show your body as well. Use a

good-sized mirror and your cell timer."
Q. How did you respond?
A. "I see what I can find. I really don't have outfits."
Q. Then what did the Sandra account say?
A. "Make something up. You can put together different things, mama, also different sexy panties will work. But, again, be very sexual in photos. Like move the panties to the side while fingering yourself. Lift up your bra while licking your nipples, et cetera."
Q. So what was the Sandra account telling you to do here?
A. She was telling me to do different positions and putting on different outfits to send pictures to the boss.
ATTORNEY MAYNARD: If we can go to page 172. Those top two messages.
BY ATTORNEY MAYNARD:
Q. What does the Sandra account say here?
A. "Make sure every photo has your face in it."
Q. And then what?
A. "Also make two to four videos of you being sexual but also that shows your face."
ATTORNEY MAYNARD: If we can go to page 174. The very last message on that page.
BY ATTORNEY MAYNARD:
Q. What does the Sandra account say to you here?
A. "Omg, my boss e-mailed me back, mama."

Q. And going the next page, the first five messages. What did the Sandra account say?
A. "So I want to know how are the photos and videos coming out?"
Q. How did you respond:
A. "Okay. What did he say?"
Q. And how did the Sandra account respond?
A. "Well, with my e-mail I told him to please not to let you go, that I'd be willing to pay for your bus to make it immediately to Springfield just so he can try you out and test you to see how good you are sexually and that I have confidence that you will show up and not play any games."
Q. So based on that message, the Sandra account said "see how good you are sexually." What did you understand that to mean?
A. That I would be out there having sex with the boss.
Q. And how did you respond to that message?
A. I put "okay."
Q. Then what did the Sandra account say?
A. That "If for any reason you come up with an excuse, lies, and you fail him and disobey him, he would fire me and push me hard core and do whatever he wants with me and even take ownership of my house and cars."
Q. What did you think the Sandra account meant by saying that to you?
A. That if I didn't do what I was supposed to be doing that

it would make her look bad and it would come back on me.

ATTORNEY MAYNARD: Can we go to page 177?

BY ATTORNEY MAYNARD:

Q. You see at the bottom of this page it says "Alexandria sent a photo."

A. Yes.

Q. Did you send more photos of yourself to the Sandra Vazquez account?

ATTORNEY MAYNARD: Ms. Minster, if we can scroll through the next photos ending on page 209.

BY ATTORNEY MAYNARD:

Q. Ms. Church, do you recognize those photos we just reviewed?

A. Yes, I do.

Q. What were those photos?

A. Those were photos of myself that I sent to the Sandra E. Vazquez account.

Q. Earlier, we saw a message where you read that the Sandra account said to you to take photos, she said "move the panties to the side while fingering yourself."

Did you see photos like that in those photos we just reviewed?

A. Yes, I do.

Q. Those earlier messages from the Sandra Vazquez account also said "Lift your bra up while licking your nipple."

Did you see photos of yourself doing that in those photos we just reviewed?
A. Yes, I do.
Q. Why did you take those photos?
A. Those were the type of photos that she had asked me to send.
Q. And why did you send them to her?
A. They were pictures to -- for the job that she had asked for me to send. They wanted clear, different photos of myself.
ATTORNEY MAYNARD: On this page that we're on, page 209, can you blow up that top message?
BY ATTORNEY MAYNARD:
Q. What does the Sandra account say?
A. "Keep sending them."
Q. Did you send more pictures?
A. Yes, I did.
ATTORNEY MAYNARD: You can go to page 223. And if we can look at those bottom two messages.
BY ATTORNEY MAYNARD:
Q. This is January 3, 2019, the timestamp is 2:13:33 UTC. What do you say to the Sandra account here?
A. "Hey, is there any way I can send more photos tomorrow? I don't want to think I forgot or anything. I'm bringing my son to the hospital. He's been getting sick and I think he might have a virus."

Q. And how does the Sandra account respond?
A. "Give me a minute, mama."
Q. Were you taking your son to the hospital at that time?
A. No, I wasn't.
Q. You weren't?
A. No.
Q. And why did you say that?
A. Just so that she would leave me alone.
Q. Did she leave you alone?
A. No, she didn't.

ATTORNEY MAYNARD: You can go to the next page, 224. And if we begin at the message timestamped 17:00:20 and those three messages.

BY ATTORNEY MAYNARD:
Q. What does the Sandra account say to you here?
A. "I did told my boss you went to the hospital."
Q. How did you respond?
A. "I was in contact with him yesterday."
Q. And then what did the Sandra account say?
A. "So he wants you to send in proofs of that immediately."
Q. Why did you think this person called "the boss" wanted you to send proofs that you were at the hospital?
A. To show that I wasn't lying to them about my son being in the hospital.

ATTORNEY MAYNARD: We can go to page 225. And blow up

that bottom message.

BY ATTORNEY MAYNARD:

Q. What does the Sandra account say to you here?

A. In all caps, "Either you are at the hospital and send proof ASAP or you are a damn liar and aren't at the hospital. You pick cause I damn for sure won't get fired and in trouble because of you."

ATTORNEY MAYNARD: If we can go to the next page, 226. And show that second message.

BY ATTORNEY MAYNARD:

Q. What did you say to the Sandra account?

A. "I told you I'm sending proof ASAP. I'm waiting on nurses and doctors."

Q. Were you really waiting on nurses and doctors?

A. No, I wasn't.

ATTORNEY MAYNARD: On that same page, if we can look at the message stamped 17:08:11.

BY ATTORNEY MAYNARD:

Q. What did the Sandra account say to you there?

A. "Take a selfie and photos where it shows you are in the hospital and photos of your son laying there."

ATTORNEY MAYNARD: If we can jump down on that same page beginning at the message 17:08:36 and look at the rest of those messages.

BY ATTORNEY MAYNARD:

Q. What does the Sandra account say?
A. "What's next? Your cell is about to die? Your cell don't take photos?"
Q. What did you say?
A. "No, I'm taking photos and sending them now."
Q. How did the Sandra account respond?
A. In all caps, "You have two minutes to do that mama."
Q. What did you say back?
A. "I got it."
Q. Then what did the Sandra account say?
A. All in caps, "Because I'm going to be straight up and honest with you, baby girl. The minute I lose my job, get fired, and get punished because of you, I will make sure you not only lose your son but you lose so much even more. Your privacy and reputation. I don't want to be a nightmare to you but if I get fired and get in trouble, who's gonna help me? Not you. Exactly."
THE COURT: Ms. Maynard, it's 11:00 so we're looking to take a break in the next couple minutes. But if you want to finish where you are and in the next few minutes, tell us when you're at a logical break point.
ATTORNEY MAYNARD: This actually may be a good place to stop.
THE COURT: Okay.
We're going to take a 20-minute break so you can go

stretch your legs, use the bathroom, and we'll see you again in just 20 minutes.

(The jury exited at 11:00 a.m.)

THE COURT: We'll start up again at 11:20.

If you could confer you will have witnesses to go through 4:30 today so I can let the jury know.

ATTORNEY GRADY: I think, Your Honor, the discussion was the possibility is that we could end short today and begin with Devyn Frank tomorrow.

There were some additional materials from discovery that counsel wanted to see. I'm happy to make that available.

THE COURT: What's ending early?

ATTORNEY GRADY: Alexandria Church plus cross. I don't know what the estimate is on that. An hour?

ATTORNEY MAYNARD: I'm about halfway through the direct.

THE COURT: Okay. Not this morning. You think you'll go into this afternoon?

ATTORNEY MAYNARD: I would imagine between the direct and the cross.

ATTORNEY RYAN: My cross is probably half hour tops.

ATTORNEY GRADY: And then the forensic examiner Daniel Yon.

ATTORNEY MAYNARD: The forensic examiner will probably be a couple hours.

THE COURT: So you think we'll be done by 4:00? I want to give them some heads up.

ATTORNEY GRADY: Or possibly earlier.

THE COURT: Okay, thank you. See you at 11:20.

(A recess was taken from 11:01 to 11:24 a.m.)

THE COURT: Is there anything we need to address before the jury?

ATTORNEY MAYNARD: No, Your Honor.

(The jury entered at 11:24 a.m.)

THE COURT: Ms. Maynard, are you ready to resume?

ATTORNEY MAYNARD: Yes, Your Honor.

THE COURT: Please proceed.

Ms. Maynard, there's a concern that you're not speaking quite loudly enough for some of the jurors, so if I could encourage you to use your microphone.

ATTORNEY MAYNARD: Maybe if I moved the microphone here where I'm looking at the screen.

THE COURT: I think that would help quite a bit, yes. In the future, if anyone can't hear, just raise your hand and we're happy to address it.

BY ATTORNEY MAYNARD:

Q. Ms. Church, do you recall that before the break, we were talking about Facebook messages in which the Sandra Vazquez account was asking you for proof that your son was in the hospital?

A. Yes.
Q. So turning back to where we left off, can you read that last message on this page?
A. All caps, "Cuz I'm going to be straight up and honest with you, baby girl. The minute I lose my job, get fired, and get punished because of you, I will make sure that you not only lose your son but that you so much, even lose your privacy and your reputation. I don't want to be a nightmare to you, but if I get fired and get in trouble, who's gonna help me? Not you. Exactly."
Q. Based on that message, were you afraid that the Sandra Vazquez account was going to do something to you?
A. Yes.
Q. What were you afraid of?
A. That she was gonna put my pictures and my information out and potentially do worse to me.
Q. What would be worse?
A. Having my son taken from me.
ATTORNEY MAYNARD: If we can go to the next page and show the first four messages. Well, the top part, I believe, is a continuation from the prior page.
BY ATTORNEY MAYNARD:
Q. So if you can begin, Ms. Church, at the top. This is a continuation from that prior page, Sandra Vazquez message.
A. All caps, "Mama, so I truly don't want to do that. But

again, I lose my job and get punished, I will make sure you do, too."

Q. Then what did the Sandra Vazquez account say?

A. All in caps, "It has been close to four minutes and you mean to tell me you haven't taken no proofs and it takes you forever to take selfies and photos since you are at the hospital."

Q. And then what?

A. "Again, you truly think you are dealing with a young chick who don't have no kids, mama."

Q. How did you respond to that?

A. "I'm not saying any of that as all I know you have kids and I've seen pictures. I wouldn't want to do anything that would jeopardize you or your family."

Q. Then how did the Sandra account respond?

A. "Well, it clearly seems to me you don't care what jeopardize you and your son and clearly are playing fire with my boss and could jeopardize so much more."

Q. What did you understand this Sandra account to mean when they said "you could jeopardize so much"?

A. I could risk losing my son and have my reputation put on the line.

ATTORNEY MAYNARD: Can we look at the rest of the messages on that page?

BY ATTORNEY MAYNARD:

Q. And I believe that top one you just read. If you can read the second one. What does the Sandra account say?
A. "I'd rather you tell me you was lying and you aren't at the hospital and I will help you for the boss not to know you lie and have you make it up immediately."
Q. And then what?
A. "Then have him find out you lie then fire me and punish me and I'd have to ruin your privacy all over and make sure you learn your lesson."
Q. And on the same page below that message it says "Alexandria sent a photo." Do you see that?
A. Yes, I do.
ATTORNEY MAYNARD: Can we go to the next page?
BY ATTORNEY MAYNARD:
Q. Now, this image has been redacted, but do you recognize this photograph?
A. Yes, I do.
Q. Have you seen the unredacted version of this photograph?
A. Yes, I have.
Q. What is it?
A. It's a picture of me and my son.
Q. Did you send that to the Sandra Vazquez account?
A. Yes, I did.
Q. Why?
A. Because they -- she said she needed proof that I was in

the hospital with my son.

ATTORNEY MAYNARD: If we can go to the next page. Again, it says "Alexandria sent a photo." And the next page.

BY ATTORNEY MAYNARD:

Q. Do you recognize this photo?

A. Yes, I do.

Q. Who is in this photo?

A. It's a picture of me and my son.

Q. Did you take that picture?

A. Yes, I did.

Q. Did you send it to the Sandra Vazquez account?

A. Yes, I did.

Q. Why?

A. Because she said she needed proof that my son was in the hospital.

ATTORNEY MAYNARD: And can we go to the next page? Again it says "Alexandria sent a photo." Can we go to the next page?

BY ATTORNEY MAYNARD:

Q. And what is that photo?

A. That is a picture of myself.

Q. And why did you send this photo?

A. It was to show that I was in the hospital, the bathroom.

Q. And, again, we mentioned this earlier, but were you actually at the hospital?

A. No, I was not.

ATTORNEY MAYNARD: Can we go to the next page and look at that top message?

BY ATTORNEY MAYNARD:

Q. After sending those photos, what did you say to the Sandra account?

A. That's the bed he's laying in and that's the shower in his room.

Q. So when you say "that's the shower in his room" were you referring to that photo that we just saw?

A. Yes.

ATTORNEY MAYNARD: If we can go back out and look at the rest of the messages on this page.

BY ATTORNEY MAYNARD:

Q. Then what did the Sandra account say to you?

A. "Okay, okay. One last test."

Q. And how did you respond?

A. "Want me to take a picture of his nurse's name?"

Q. Then what?

A. "Or a picture of her?"

Q. How did the Sandra account respond to that?

A. All in caps, "Go to the shower room, pull up your shirt and bra off and take a photo showing your tits, then go lay next to him and take a photo with your son like you did with a peace sign."

Q. Then what did they say?
A. "Do that immediately, mama."
Q. And how did you respond?
A. "Okay, I got it."
Q. And below that on the same page you see it says "Alexandria sent a photo."
Did you send more photos to the Sandra account?
A. Yes, I did.
ATTORNEY MAYNARD: Can we go to the next page? And the next page. Again it says "Alexandria sent a photo." Can we go to the next page? And can we actually go back a page? Thank you.
BY ATTORNEY MAYNARD:
Q. What were those pictures that we just saw?
A. Those were the pictures that the Sandra E. Vazquez account asked me to send -- the one in the shower with my bra off and the other one laying next to my son holding up a peace sign.
ATTORNEY MAYNARD: Can we go to page 237? And can we blow up those first two messages?
BY ATTORNEY MAYNARD:
Q. After sending those photos, what did you say to the Sandra account?
A. "Like I said, not trying to jeopardize your job or mine or trying to have my son taken away from me. He's all I have in my life. I can't lose him."

Q. How did the Sandra account respond?
A. "Good job, mama. Well, I'm glad you don't want to lose your son, mama. Again, I can help you in so much but, I can also be a nightmare and have him taken away from you so quick and you have -- and have you lose so much more. Don't want that do that."
Q. What did you understand the Sandra Vazquez account to be saying to you there?
A. That if I didn't do what I was told and exactly how to do it that they would take my son from me.
ATTORNEY MAYNARD: If we can go on this same page to the message with timestamp 17:30:34 and the one right below it -- the next one, sorry, that begins "one last thing" and the message below that.
BY ATTORNEY MAYNARD:
Q. What did the Sandra account say to you here?
A. "One last thing, take a photo with your son grabbing your tits or sucking your tits and then looking at the camera."
Q. And below that?
A. "Camera."
Q. "And then what?"
A. "That will be your last test which will prove everything."
ATTORNEY MAYNARD: Okay. If we can look at the rest of the messages on that page.
BY ATTORNEY MAYNARD:

Q. How did you respond?
A. "I can try and have him grab it. He grabs my hands more."
Q. Then how did the Sandra account respond?
A. "Cuz to me honestly that doesn't look like a hospital."
Q. Then what did you say?
A. "It's a hospital that they have out here."
Q. And then what?
A. "But I will send you the picture now."
ATTORNEY MAYNARD: And can we go to the next page, 238? And if we could blow up those messages on this page.
BY ATTORNEY MAYNARD:
Q. Then what did the Sandra account say to you?
A. "Well, try to put your nipples inside his mouth and take clear photos."
Q. And then what?
A. "And also do a quick video where you're trying for him to suck your tits."
Q. And then what?
A. "I've done it before so I know you can, mama."
Q. And then what did the Sandra account say?
A. In all caps, "Again, that's your official last test."
Q. How did you respond?
A. "He wouldn't suck on it, I tried but I have him playing with my nipples and then squeezing my chest."
ATTORNEY MAYNARD: You can back out of that.

BY ATTORNEY MAYNARD:

Q. Below that it says "Alexandria sent a photo." Did you send the Sandra account the photos that were requested?

A. Yes, I did.

ATTORNEY MAYNARD: Ms. Minster, if we can switch to the other laptop at this point.

THE COURT: Make sure we adjust that other screen as well. Thank you, Mr. Ryan.

Ms. Maynard, I don't know if you could maybe spin that screen around. If you want to stand on this side so you can look at it while addressing her, that would be fine.

ATTORNEY MAYNARD: That is a good idea. Thank you, Your Honor.

THE COURT: Mr. Ryan, I assume you have these already, but of course you're welcome to reposition yourself.

ATTORNEY RYAN: Yes, thank you, Your Honor.

ATTORNEY MAYNARD: Your Honor, I understand there's a technical issue. I don't know if it would make sense to do a quick break.

THE COURT: Sure. Do you want a five-minute recess?

ATTORNEY MAYNARD: That should be plenty. Thank you.

THE COURT: We'll take a quick five-minute recess. Grab another drink and we'll be right back to it.

(The jury exited at 11:42.)

ATTORNEY MAYNARD: And there it goes.

THE COURT: Two-minute recess, perhaps.

ATTORNEY MAYNARD: It's working now. As soon as we got them out.

(A recess was taken from 11:42 to 11:45 a.m.)

(The jury entered at 11:49 a.m.)

THE COURT: Thank you all.

As you may have guessed, images involving children, we give a fair bit of extra security to and that's some of the technical challenges that we were dealing with.

Ms. Maynard, whenever you're ready.

ATTORNEY MAYNARD: Thank you, Your Honor. Ms. Minster, if we can show Exhibit 1-1, this is going to be the unredacted version of the Facebook chats that we were just looking at. And if you can go to page 239 and show that for approximately three seconds. And would it be possible to Zoom out a little so we can see the entire -- thank you.

And if we can go to page 241 for approximately three seconds.

And page 243 for approximately three seconds.

BY ATTORNEY MAYNARD:

Q. Ms. Church, do you recognize those photos that we just saw?

A. Yes, I do.

Q. Who was in those photos?

A. My son.

Q. Who else was in them?
A. Myself as well.
Q. What was your son doing in those photos?
A. He was squeezing or grabbing my nipples.
Q. Did you take those photos?
A. Yes, I did.
Q. Why did you take them?
A. The Sandra E. Vazquez account asked me to send those type of photos to her to show proof that my son was in the hospital with me.
Q. What did you think was going to happen if you didn't send those photos?
A. That there was going to be consequences and my son was going to be taken away from me.
Q. Now, at the top of this page --
ATTORNEY MAYNARD: And we're on page 244 still. Can you blow up that message?
BY ATTORNEY MAYNARD:
Q. Ms. Church, what do you say to the Sandra Vazquez account in this message?
A. "The video he's giving kisses at the end."
Q. And then below that do you see it says "Alexandria sent a video"?
A. Yes, I do.
Q. Did you send a video to the Sandra Vazquez account?

A. Yes, I did.

ATTORNEY MAYNARD: Ms. Minster, if we can have Exhibit 2. And for the record, this is set at the eight-second mark. Can we play this through to the 13-second mark?

(Attorney Maynard and Attorney Grady confer.)

THE COURT: Ms. Maynard?

ATTORNEY MAYNARD: If we could have the screen taken down just for a second so she could cue up the video.

THE COURT: Sure. If we could put the screen just to the witness. That accomplishes what you're looking for?

ATTORNEY MAYNARD: That would work. You can share it now.

And we can take that down. And we can switch back to the other computer now.

BY ATTORNEY MAYNARD:

Q. Ms. Church, did you recognize that video that was just played?

A. Yes, I do.

Q. Who was in that video?

A. Myself and my son.

Q. And who took that video?

A. I did.

Q. What was your son doing in that video?

A. He was squeezing and grabbing my nipples.

Q. And what did he do at the end of the video?

A. He was blowing kisses.
Q. Did you take that video?
A. Yes, I did.
Q. Why did you make that video?
A. I sent it to the Sandra E. Vazquez account to show proof that I was in a hospital with my son because she had asked me to send that type of video.
Q. What did you think would happen if you didn't send that video?
A. That my son was going to be taken from me.
Q. Why did you think that?
A. Because she had threatened me and told me that if I didn't do what I was told my son would be taken from me.

ATTORNEY MAYNARD: Ms. Minster, can we go back to Exhibit 1-2; that's the redacted version of the Facebook chat. And can we go to page 244?

BY ATTORNEY MAYNARD:
Q. So at the top, this is the page that we were previously looking at before we watched that video.

ATTORNEY MAYNARD: Ms. Minster, if we can blow up the remaining messages starting at 17:36:57.

BY ATTORNEY MAYNARD:
Q. So after you sent that video, how did the Sandra Vazquez account respond?
A. She responded "Okay, great job."

Q. And then what?
A. "And you asked earlier and yes send me a photo of the nurse name and a photo of her."
Q. Then what did they say?
A. In all caps, "Heck, I hope she's cute and sexy, LOL."
Q. And how did you respond?
A. "Like I said I don't want to lose my son and for what I just sent you, I could lose him just by that."
Q. Why did you think you could lose your son from sending that?
A. Because it was a video and a -- it was a picture of him squeezing my chest.
Q. How did the Sandra account respond to that?
A. "Of course you could, mama. I'm glad you are fully aware that just by what you sent right now and the video, it could take less than 30 minutes for DCF in Virginia to go and take him away from you immediately."
Q. And then what did the Sandra account say?
A. "But I don't want that, right?"
Q. And then what?
A. "I want that either, mama, I'm a mother like you."
Q. And how did you respond?
A. "No, I don't want that. I would never want that at all. I love my son and I've been in foster care before. I was sexually assaulted from 6 to 10 and I don't want my son to be

in foster care."

ATTORNEY MAYNARD: If we could go to the next page. And about the first half of that page.

BY ATTORNEY MAYNARD:

Q. How did the Sandra account respond?

A. In all caps, "Exactly. So as long as you keep obeying and doing what you're told by my boss or by me then your son won't be taken, your reputation will keep being private, and nothing will be out there."

Q. How did you respond?

A. "Thank you."

Q. And then what did the Sandra account say?

A. "Where you live, what city does a Greyhound bus go by?"

Q. And then what?

A. "Like, how close are you from a Greyhound bus station, and what's the name of the city that the station is at?"

Q. How did you respond?

A. "Wytheville, I believe that's how you spell it. It's in Virginia. It's, like, a 30-minute drive I believe."

THE COURT: Ms. Church, can I ask you to slide the microphone just a little bit away from you. I think that's what's creating the -- perfect. Thank you.

ATTORNEY MAYNARD: And if we could see the messages on that page.

BY ATTORNEY MAYNARD:

Q. Then what did you say?
A. "When I came out here I was picked up in Charlotte."
Q. Then what?
A. "North Carolina."
Q. Then what did the Sandra account say?
A. "Because I need you to come and please our boss for the weekend on Saturday."
Q. What did you think the Sandra account meant when they said "come and please our boss this weekend"?
A. To go out there and potentially have sex with the boss.
Q. And what did the Sandra account say after that?
A. "Remember, no excuse and you will obey and follow orders. Am I right?"
Q. And below that, do you see it says "The Sandra account sent a photo"?
A. Yes.

ATTORNEY MAYNARD: We can go to the next page. And blow up those messages below that.

BY ATTORNEY MAYNARD:
Q. Then what did the Sandra account say?
A. "Am I right?"
Q. How did you respond?
A. "Yes, I will follow orders, if I don't there goes my son."
Q. Why did you respond that way?
A. Because I knew if I didn't do what I was told that my son

would be taken from me.
Q. Then how did the Sandra account respond to you?
A. "Not just your son, mama, but so much too. Like your reputation, your privacy, et cetera."
Q. And then what?
A. "Again, that's not gonna happen unless you get me fired and get me punished."
Q. How did you respond?
A. "I know. I don't want or need those photos being out there."
Q. And below that it says "Sandra sent a photo." Do you see that?
A. Yes, I do.
ATTORNEY MAYNARD: Can we go to the next page? That's the rest of the information.
Can we go to the next page?
And the next page.
BY ATTORNEY MAYNARD:
Q. Did you recognize that photo that we just saw?
A. Yes, I do.
Q. What was that a photo of?
A. Those are photos of myself with a photo of my ID in it as well.
Q. Were those pictures that you had sent to the Sandra Vazquez account?

A. Yes, they were.
Q. And you said that your ID was in the middle of that?
A. Yes, it was.
Q. When the Sandra account sent you that with those photos, what did you understand that to mean?
A. That if I didn't do what I was told and didn't do exactly, that they would put that information out there.
Q. What do you mean by "that information"?
A. The photos that I had taken and a picture of my ID with them.
ATTORNEY MAYNARD: If we can blow up larger the first half of the messages on this page.
BY ATTORNEY MAYNARD:
Q. So after sending that photo that we just saw, what did the Sandra account say to you?
A. "Exactly, mama. So keep obeying my boss and keep listening to me and I will make sure you don't lose your son or your privacy and I will make sure you get hired from my boss."
Q. How did you respond?
A. "I got it. I understand. I'm already in tears to think that I could lose my son and that things like that could be put out there."
Q. Then what did the Sandra account say?
A. In all caps, "Is that what you really want?"
Q. And then what?

A. In all caps, "Damn it, wipe those tears off because I did say nothing will happen unless you disobey and don't follow orders and get me fired and punished with our boss."
Q. And how did you respond to that?
A. "I don't want to lose him or have anything of that put out there. To be honest it would ruin everything for me and at that point there would be no point honestly wanting to be in this world."
Q. And then what did you say?
A. "I suffer from depression and being sexually assaulted and abused and mistreated so it takes a lot for me not to sink back into my old ways. And the only thing that would prevent me from that is the fact that I have my son. He is my pride and joy and without him I have nothing."
ATTORNEY MAYNARD: Can we go to the next page? And can you blow up those first two messages, Ms. Minster?
BY ATTORNEY MAYNARD:
Q. And what is that top message?
A. In all caps, "I may want you in Springfield tonight."
Q. And how did you respond?
A. "Got it. Whatever you say goes and the same for the boss."
ATTORNEY MAYNARD: And on that same page, if we can start at the message with timestamp 18:05:57.
BY ATTORNEY MAYNARD:

Q. What did the Sandra account say to you here?
A. In all caps, "Exactly how much are you getting paid Saturday?"
Q. How did you respond?
A. "Not a lot. Enough to last me two weeks."
Q. Then what did the Sandra account say?
A. In all caps, "I asked you how much, mama."
Q. How did you respond?
A. "265."
ATTORNEY MAYNARD: If we can goo to the next page. And the message with timestamp 18:08:54. That and the one below it.
BY ATTORNEY MAYNARD:
Q. So you saw in that message that you just read you had responded 265, right?
A. Yes.
Q. Then what does this Sandra account say here?
A. "You gonna take out 260, pay your one-way ticket and that's it. You are not to touch one dollar from what's left and you bring all that's left with you."
Q. How did you respond?
A. "Got it."
Q. What did you think the Sandra account meant by that?
A. To take the money out that I was getting and to buy a ticket out there and not touch the remaining balance that was

left over.

Q. Why did you think that they wanted you to not touch what was left?

A. They wanted to use it for something else.

Q. And you responded "got it." Why did you respond that way?

A. That I knew if I were to touch it that there would be more consequences.

ATTORNEY MAYNARD: Can we go to the bottom of that page? The last two messages. Sorry, below that.

BY ATTORNEY MAYNARD:

Q. What does the Sandra account say here?

A. In all caps, "And how and in what ways are you gonna pleasure our boss?"

Q. And next there's a message from you.

ATTORNEY MAYNARD: If we can go to the next page.

BY ATTORNEY MAYNARD:

Q. How did you respond?

A. "Whatever he asked me to do. I told him I've been a pet before so I will obey orders like I'm told."

Q. When the Sandra account asked in what ways are you gonna pleasure your boss, what did you understand that you were going to have to do?

A. To do whatever the boss asked me to do -- either have sex with him or to do whatever as he asked me to do.

ATTORNEY MAYNARD: Okay, we can go out of that.

And can you blow up the rest of the messages on that page?

BY ATTORNEY MAYNARD:

Q. So after saying you would do whatever, then what did you say?

A. "And if I do I get punished."

Q. Then what did the Sandra account say?

A. In all caps, "What are you gonna do if he wants to take you to one of his spare apartments? As long as you're willing to please him while your son is around then that's fine."

Q. Then what did the Sandra account say?

A. "Again, it will be kept private and it will be only be him you gotta please."

Q. How did you respond?

A. "I will please him in any way. I can distract my son and give him my phone, it's not hard."

Q. And then what did you say?

A. "As long as I don't lose my son, I will please him in any way that I have to that will make him happy."

Q. And how did the Sandra account respond?

A. In all caps, "I will see if my boss will accept you bringing your son. If he says you're not allowed, you're still gonna show up and do whatever it takes to leave him with your grandma."

Q. So in that message above, it when you said,

"As long as I don't lose my son, I will please him in any way." What did you mean by that?
A. That I didn't want my son taken from me. I didn't want my son involved if I were to go visit him.
Q. Why did you think your son might be taken away?
A. Because of the photos that I had already sent to him.
Q. And what were you saying that you were gonna do in order for that not to happen?
A. I was going to obey and to do anything that he asked me to do.
Q. And what types of things was he asking you to do?
A. To please him and have sex with him.
ATTORNEY MAYNARD: We can go to page 255 and the second and third messages on that.
BY ATTORNEY MAYNARD:
Q. What did the Sandra account say to you here?
A. In all caps, "Here's a quick test and challenge for you. Let's see how you really listen to my orders and how much you care about everything. Don't text him anything else, just text my boss your user name and password for Facebook immediately. Then I'll ask him -- e-mail him and confirm you did the following -- my order."
Q. And then what?
A. "Do that now, mama, immediately."
Q. And how did you respond to that?

A. I responded "okay."
Q. And then what?
A. "It's done."
Q. And if we go to the bottom of that page, do you see it says "Alexandria sent a photo"?
A. Yes.
ATTORNEY MAYNARD: And can we go to the next page? And the next one.
BY ATTORNEY MAYNARD:
Q. Do you recognize this photo?
A. Yes, I do.
Q. What is this photo?
A. It is a picture of my user name and password to my Facebook account.
Q. And I guess more broadly, what is this a photo of?
A. It is a photo sent to the person underneath my phone as boss.
Q. Is it a screenshot?
A. Yes it is.
Q. And you see and at the top it says "boss." Did you save that as boss?
A. Yes, I did.
Q. And the information contained in that bubble, what is that information?
A. That is my user name and password sent to my Facebook

account.
Q. So did you send this screenshot to the Sandra Vazquez account?
A. Yes, I did.
Q. Why?
A. Because that's what I was asked to do.
Q. And was this showing that you had sent your Facebook user name and log in as requested?
A. Yes.
ATTORNEY MAYNARD: Can we go to page 257?
And those top four messages, please.
BY ATTORNEY MAYNARD:
Q. So after you sent that screenshot, what did the Sandra account say?
A. "I e-mailed my boss and he replied asking whose information did he receive."
Q. Then what?
A. "And I said it was sent by mistake, to forget it, and he said okay and erased it."
Q. How did you respond?
A. Okay.
Q. And then what did the Sandra account say?
A. "Okay. Wow. I'm very, very impressed."
Q. And if we can look at the next four messages below that. Then what did the Sandra account say?

A. "You did listen to my orders, huh? Wow, mama. Great job, beautiful."
Q. How did you respond?
A. "I told you I'm not trying to lose my son. I can't lose my world. If I lose him."
Q. Why did you say that?
A. Because I know that if I didn't do what I was told and do exactly as they asked me to do it, that I could have my son taken from me.
Q. After that, what did the Sandra account say?
A. "Instead of boss you should save him under 'my master,' LOL."
Q. And how did you respond?
A. I'll change it now.
ATTORNEY MAYNARD: Can we go to page 259?
ATTORNEY MAYNARD: And this says "Alexandria sent a photo."
Can we go to the next page?
BY ATTORNEY MAYNARD:
Q. What is this a photo of?
A. That is a screenshot from a photo that I took.
Q. And what do we see in this screenshot?
A. It's a -- it shows that I changed boss under my master in my phone.
Q. And what is the phone number that's associated with that?

A. That is his phone number.
Q. The person you had saved previously as the boss?
A. Yes.
ATTORNEY MAYNARD: Can we go to the next page, 261? And if we can blow up those last two messages.
BY ATTORNEY MAYNARD:
Q. What did the Sandra account say to you?
A. "My boss don't like no females taking no pills while pleasing him. Only pills you can take is tramadol, Xanax or Percs on Saturday."
Q. And then what?
A. "But that's about it."
ATTORNEY MAYNARD: Can we go to the next page?
BY ATTORNEY MAYNARD:
Q. And how did you respond?
A. "Okay. I don't take any of that. Last time I took Percs were in October of last year for two weeks for the pain. The only thing I take besides birth control is Tylenol."
Q. And how did the Sandra account respond?
A. "What if I want you to take those pills and get drunk for the boss on Saturday?"
Q. And then what?
A. "You will tell me no?"
Q. How did you respond?
A. "That's fine; I'll take them."

Q. Why did you say that?
A. Because I was worried to have my son taken from me, that if I didn't do as I was told that it would happen.
ATTORNEY MAYNARD: Can we go to page 296?
And beginning with the second message about halfway down.
BY ATTORNEY MAYNARD:
Q. What did you send to the Sandra account here?
A. "Just got off the phone with him. Wow, his voice is sexy as hell. Had me wanting to bite my lip already."
Q. When you said "got off the phone with him," what "him" were you referring to?
A. The boss.
Q. How did the Sandra account respond?
A. She put, "OMG shut up."
Q. And then what?
A. "Did he call you?"
Q. And then what?
A. "When? Now?"
Q. And what next?
A. "How did that go, mama? OMG, I wanna know the whole scoop."
Q. And how did you respond?
A. "Just got off the phone with him."
ATTORNEY MAYNARD: And if we can see the rest of the

messages on that page.

BY ATTORNEY MAYNARD:

Q. What did the Sandra account say to you?

A. "Don't worry, we'll keep it between you and I."

Q. And how did you respond?

A. "Went good as far as I know, he told me to keep in touch and that he liked that I wasn't shy on the phone and that I was talkative, like how I answered questions he asked me."

Q. Then what did you say?

A. "He did mention you for a few things."

Q. And there when you said "you," you were referring to the Sandra Vazquez account person?

A. Yes.

Q. What did you say next?

A. "And he pretty much wanted to make sure that I was single, who I lived with, do I drink or smoke, do I have any other kids besides my son."

Q. Then what did you say?

A. "Yeah, he mentioned he knows you for a while and that you talked to him about me and that you mentioned to him about his accent too and wanted to sleep with him."

Q. And then what did you say?

A. "With his accent it makes me wonder what the rest of him looks like."

ATTORNEY MAYNARD: Can we go to the next page?

BY ATTORNEY MAYNARD:
Q. And on this page, do you see that there are messages from January 4, 2019?
A. Yes.
ATTORNEY MAYNARD: And if we can look at those last three messages.
BY ATTORNEY MAYNARD:
Q. What do you say to the Sandra account?
A. "Hey."
Q. And how does the Sandra account respond?
A. "Can't stand Fridays, LOL. They are like huge migraines for me. Been extremely busy since 5:00 a.m."
Q. And how did you respond?
A. "Aww, I'm sorry to hear that, love."
ATTORNEY MAYNARD: And we can close that.
BY ATTORNEY MAYNARD:
Q. So in this version that we're looking at there's a redaction below. But you've looked at the original version of this, right?
A. Yes.
Q. And is that where the conversation ends between you and the Sandra Vazquez account?
A. Yes.
Q. Did you communicate with either the person you believed to be Sandra Vazquez or the boss outside of these Facebook

communications?
A. Yes, I did.
ATTORNEY MAYNARD: Ms. Minster, can we see Exhibit 3?
BY ATTORNEY MAYNARD:
Q. And before I ask about this, how did you communicate?
A. I sent text messages to the phone number that was underneath the boss.
Q. Did you also send text messages to the person you believed to be Sandra Vazquez?
A. Yes.
Q. So looking now at Exhibit 3. Do you recognize this photo?
A. Yes, I do.
Q. And there are some redactions on it, but can you tell from what you see what's depicted in this photo?
A. Yes, I do.
Q. What do you see here?
A. It's a birth certificate, a social security card, and some paperwork.
Q. Do you know whose birth certificate that is?
A. Yes, I do; it's my son's.
Q. Do you know whose social security card that is?
A. Yes. It is my son's.
Q. And the paperwork from a medical office, do you know whose medical paperwork that belongs to?
A. Yes, it's my son's.

Q. Did you take this picture?
A. Yes, I did.
Q. What did you do with it?
A. I sent it to either Sandra or the boss.
Q. Why did you send them a photograph of these documents?
A. It was other information that they had asked for through text message.
Q. What had they asked for?
A. They had asked for documentations of my son's birth certificate, social security card, and paperwork showing that my son was autistic.
Q. What did you think would happen if you didn't send them that information they asked for?
A. That my son would be taken from me and that my -- the pictures that I had sent to them would be out in the world.
Q. Aside from this information that we're looking at right now, did they ask you for anything else?
A. They had asked me for more pictures and videos of my son and me.
Q. What kind of pictures?
A. Pictures of myself naked with my son.
Q. With your son doing what?
A. Touching me, touching my boob, and touching other parts of me.
Q. Did you do that?

A. Yes, I did.

ATTORNEY MAYNARD: Ms. Minster, we need to switch to the other computer.

Ms. Minster, if you can pull up Exhibit 4-1 and show it for approximately three seconds.

If you can show Exhibit 4-5 for approximately three seconds.

And Exhibit 4-6 for approximately three seconds.

BY ATTORNEY MAYNARD:

Q. Ms. Church, do you recognize those photographs that we just saw?

A. Yes, I do.

Q. Who was in those photographs?

A. It was myself and my son.

Q. And could you see a face in those pictures?

A. Yes.

Q. Whose face?

A. My face.

Q. And you said your son was also in the picture?

A. Yes, he was.

Q. What part of your son could you see?

A. His hands and his -- the top of his head.

Q. What was he doing with his hands?

A. He was having -- his hands were on my vagina.

Q. Did you take those photos?

A. Yes, I did.
Q. Why?
A. Because I was told to take those photos and send them -- that if I didn't do it, that they were going to take my son from me.
Q. Who told you that?
A. The boss did.
Q. And did you send those photos either to the person you thought was Sandra Vazquez or the person you referred to as the boss?
A. Yes, I did.
Q. Do you remember what you used to send those photos?
A. I sent it through a text -- iPhone, and I sent it through a text message.
Q. How old was your son in those photos?
A. About three -- about three years old.

ATTORNEY MAYNARD: Ms. Minster, if we can see Exhibit 4-2 for approximately three seconds.

And 4-3 for approximately three seconds.

And Exhibit 4-7 for approximately three seconds.

Exhibit 4-8 for approximately three seconds.

And Exhibit 4-9 for approximately three seconds.

BY ATTORNEY MAYNARD:
Q. Ms. Church, do you recognize those photos that we just reviewed?

A. Yes, I do.
Q. Who was in those pictures?
A. Myself and my son.
Q. What was your son doing in those pictures?
A. He was playing with my vagina.
Q. Did you take those?
A. Yes, I did.
Q. Why?
A. Because I was told to take them, and if I didn't do what I was told that they were going to take my son from me.
Q. What did you do with those pictures after you took them?
A. I sent them to the boss.
Q. And do you remember how you sent them?
A. I sent them through a text message.
Q. And how old was your son in those pictures?
A. Three. He was three years old.
ATTORNEY MAYNARD: Ms. Minster, if we can have Exhibit 4-4 for approximately three seconds.
BY ATTORNEY MAYNARD:
Q. Ms. Church, do you recognize that photograph that we just saw?
A. Yes, I do.
Q. Who was in that picture?
A. Myself and my son.
Q. And what was your son doing in that picture?

A. I was sitting on top of his face.
Q. Did you take that picture?
A. Yes, I did.
Q. And what did you do with it after you took it?
A. I sent it to the boss.
Q. Do you remember how you sent it?
A. I sent it through a text message.
Q. Why?
A. Because he threatened -- they threatened me and told me that if I didn't send it that they would take my son from me.
ATTORNEY MAYNARD: We're done with that computer.
BY ATTORNEY MAYNARD:
Q. Ms. Church, before you came here today, did you speak with any investigators or attorneys from the Government?
A. Yes.
Q. So I want to direct your attention back a few years to April of 2023.
A. Okay.
Q. At that time, did you enter into an agreement with the Government?
A. Yes, I did.
ATTORNEY MAYNARD: Ms. Minster, can you pull up Exhibit 6? Thank you.
BY ATTORNEY MAYNARD:
Q. And do you see next to the one here that says, "change of

plea"?
A. Yes.
Q. And in the "re" line at the top, do you see it says *United States v. Alexandria Church*?
A. Yes, I do.
Q. Is this the plea agreement that you entered into with the Government?
A. Yes, it was.
ATTORNEY MAYNARD: And can we go to page 6?
BY ATTORNEY MAYNARD:
Q. Is that your signature?
A. Yes, it is.
Q. And when is it dated?
A. 4/19/23.
Q. And do you know whose signature is below that on the same page?
A. My lawyer.
ATTORNEY MAYNARD: Can we go back to page 1? And can we blow up that first paragraph under change of plea?
BY ATTORNEY MAYNARD:
Q. So as part of this agreement, were you pleading guilty to certain crimes?
A. Yes, I was.
Q. Do you understand what you were pleading guilty to?
A. Yes, I do.

Q. What were you pleading guilty to?
A. I was pleading guilty to distribution to child pornography.
Q. And did you understand that you were getting anything in exchange for pleading guilty?
A. Yes.
Q. What did you understand?
A. That if I testified and told the truth that I would potentially get a lower -- potentially a lower sentence.
Q. Do you see in this second paragraph highlighted here, it says, "The U.S. Attorney agrees not to charge defendant" and it lists the statute, another statute, 18 U.S.C. Section 2251(a) based on the conduct underlying the crime charged in this case.
Did you understand that that meant there was something else you could be charged with?
A. Yes.
Q. And as a result of this agreement you weren't being charged with that?
A. Yes.
Q. Now, you just testified about you understood that you were agreeing to testify; is that right?
A. Yes.
ATTORNEY MAYNARD: So can we pull up Exhibit 5?
BY ATTORNEY MAYNARD:
Q. And do you see in the "re" line of this that it says

"cooperation agreement"?

A. Yes, I do.

Q. And is this an agreement that you entered into with the Government?

A. Yes, it is.

ATTORNEY MAYNARD: Can we go to page 6?

BY ATTORNEY MAYNARD:

Q. Is that your signature?

A. Yes, it is.

Q. And what is it dated?

A. 4/19/23.

Q. And do you know whose signature is below that?

A. My lawyer.

ATTORNEY MAYNARD: And if we can go back to page 1.

BY ATTORNEY MAYNARD:

Q. Now, again, you already mentioned that as part of this agreement you were agreeing to testify; is that right?

A. Yes.

Q. And aside from that, what did you understand your obligations to be under this agreement?

A. To testify and tell the whole truth.

Q. And what did you understand that, if anything, you would be getting in exchange for doing that?

A. That I would get a reduced -- I would get a lesser sentence.

ATTORNEY MAYNARD: And if we can go to page 2.

And the second paragraph under Section 2.

BY ATTORNEY MAYNARD:

Q. And if we look at the second sentence there, do you see it says the U.S. Attorney -- well, I'll start at the beginning.

"The determination whether defendant has provided substantial assistance rests solely in the discretion of the U.S. Attorney and is not subject to appeal or review.

"The U.S. Attorney will make this determination based on the truthfulness and value of the defendant's assistance, regardless of the outcome or result of any proceeding or trial."

So what did you understood that to mean?

A. That I needed to tell the truth about everything I'm stating on the witness stand.

Q. And do you understand that ultimately, any sentence you receive is up to a judge, it's not up to the Government or the U.S. Attorney's Office?

A. Yes, I do.

ATTORNEY MAYNARD: If I could one second, Your Honor.

THE COURT: Sure.

(Attorney Maynard confers with Attorney Grady.)

ATTORNEY MAYNARD: That's all I have, thank you.

THE COURT: Thank you. Mr. Ryan?

ATTORNEY RYAN: Thank you.

CROSS-EXAMINATION

BY ATTORNEY RYAN:

Q. Good afternoon, Ms. Church.

A. Good afternoon.

Q. My name is Luke Ryan. I represent Bairon Ubeda. I have some questions for you and the first one is this: You and I have never met before, correct?

A. Correct.

Q. And I think you just said that you had met with Ms. Maynard and Mr. Grady before today, correct?

A. Yes.

Q. And you've met with other Government attorneys and investigators as well, correct?

A. Yes.

Q. In fact, many times. Correct?

A. Yes.

Q. Now, Ms. Maynard just asked you some questions about a criminal case where you were the defendant in that criminal case, correct?

A. Yes.

Q. That criminal case is in this court and it's called *United States v. Alexandria Church*, right?

A. Yes.

Q. And back on January 16 of 2020, you were charged with two crimes, correct?

A. Yes, I was.
Q. We talked about one of those crimes -- distribution of child pornography -- right?
A. Yes.
Q. But the other crime was conspiring to commit sexual exploitation of a child, correct?
A. Yes.
Q. Now, on January 22 of 2020, you were arrested on these charges, weren't you?
A. Yes, I was.
Q. You were in North Carolina at the time?
A. Yes.
Q. And some United States Marshals transported you from North Carolina up here to Springfield, correct?
A. Yes.
Q. And you first appeared in this court on February 27 of 2020, correct?
A. Yes.
Q. So there was about five months between your -- five weeks between your arrest in North Carolina and your first appearance in this court; correct?
A. Yes, it was.
Q. You were incarcerated for those five weeks weren't you?
A. Yes, I was.
Q. And you were 24 or 25 years old at the time?

A. I was 24.
Q. This is the first time you've been in jail?
A. Yes, it is.
Q. Fair to say you did not like being in jail, did you?
A. No.
Q. When you're in jail you can't spend time with your friends, right?
A. Correct.
Q. Can't spend time with your family, right?
A. Correct.
Q. You have to eat the food that they give you, right?
A. Yes.
Q. And that food can be pretty terrible, right?
A. Yes.
Q. You have no privacy at all, correct?
A. Correct.
Q. And you have to be worried about your safety at all times, don't you?
A. Correct.
Q. Basically, being in jail is terrible, isn't it?
A. Yes, it is.
Q. And you didn't want to be there when you were there, correct?
A. Correct.
Q. And you wanted to get out, right?

A. Yes.
Q. Now, at your first appearance in this court on February 27 of 2020, I think you mentioned his name. There was a lawyer named Timothy Watkins who represented you?
A. Yes, he was.
Q. And during that first appearance in this court, the Government or the prosecution filed a motion seeking to continue your detention, correct?
A. Yes.
Q. Essentially, they asked a judge to keep you in jail while these two charges against you were pending, right?
A. Yes.
Q. And you didn't get out of jail that day, right?
A. No.
Q. You stayed in jail until the next time you came back to court; right?
A. Yes.
Q. And that was on March 12 of 2020; right?
A. Yes.
Q. You were transported by marshals from where you were being held. Where were you being held, incidentally, do you remember?
A. I believe I was being held in Rhode Island.
Q. So you were in Rhode Island, you had to get on a van and travel out some two hours this way to show up to court for that

second time in court in this case; correct?
A. Correct.
Q. Those van rides aren't very fun, are they?
A. No.
Q. Are you shackled during the trip?
A. Yes, I am.
Q. So back on March 12, by this point it had the been nearly two months that you had been incarcerated on these two charges, correct?
A. Correct.
Q. And jail was still pretty terrible, correct?
A. Yes.
Q. And you still wanted to get out, right?
A. Yes.
Q. Now, I'd like to ask you something else that happened on March 12 outside the courtroom.
ATTORNEY RYAN: May I approach, Your Honor?
THE COURT: Of course.
BY ATTORNEY RYAN:
Q. I'm showing you a two-page document. If you could just take a minute to review that.
So this is a letter addressed to Attorney Watkins, correct?
A. Yes.
Q. And on the second page of that letter, your signature is

there, right?
A. Yes, it is.
Q. And it's dated March 12, 2020, correct?
A. Yes, it is.
Q. And below your signature is Attorney Watkins' signature as well, correct?
A. Yes.
Q. Now, this letter that is addressed to him confirmed that the United States -- the Government, would consider an accurate and complete proffer from you in connection with the production and distribution of child pornography, correct?
A. Yes.
Q. When you signed this letter, you agreed to talk with representatives of the Government about this case; correct?
A. Yes.
Q. Meaning the prosecutor; right?
A. Yes.
Q. And as well as any agents for the Government, correct?
A. Yes.
Q. Police detectives, correct?
A. Yes.
Q. And one week after you signed this agreement agreeing to talk about this case with Government prosecutors and agents, the prosecutor withdrew the request for your detention, correct?

A. Yes.
Q. One week after you signed this agreement to talk with the prosecutor, detectives, and agents, they let you out of jail, didn't they?
A. Yes, they did.
Q. In that jail that you hated being in so much, right?
A. Yes.
Q. They let you leave Massachusetts, right?
A. Yes.
Q. And you got to return to your home, which at that time was still in North Carolina, correct?
A. Yes.
Q. Now, I'd like to get back to these initial charges you faced in this case. And a moment ago we talked about how the Government started off by charging you with two crimes, right?
A. Yes.
Q. And this first charge was conspiring to commit sexual exploitation of a child, right?
A. Yes, it was.
Q. And you understand that to mean conspiring to produce child pornography, right?
A. Yes.
Q. This charge was based on your creation of those photographs that were shown today, correct?
A. Yes.

Q. And just so that I'm -- we're specific here, there were some photographs that you took that you sent by Facebook that showed you with your shirt off and your son manipulating your breasts. Do you remember those?
A. Yes, I do.
Q. Now, you understand there's a legal difference between those photographs that you sent by Facebook and those other photographs that we reviewed that showed your son with you and -- either touching or being straddled by your genitals, correct?
A. Yes.
Q. So just so we all agree, all of those pictures are horrible and awful, right?
A. Yes.
Q. I think you said it both in your Facebook message and when you testified earlier, just the ones of your son playing with your breasts, that was wrong and you could have lost your son for taking those pictures, correct?
A. Yes.
Q. But you understand that legally that's not -- actually doesn't meet the definition of child pornography, right?
A. Yes.
ATTORNEY MAYNARD: Objection, Your Honor. He's asking for a legal conclusion.
THE COURT: Approach sidebar.

(A conference was held at sidebar.)

ATTORNEY MAYNARD: I don't disagree with his characterization, those do not meet the legal definition. But I don't know that she -- what she understands. She's not an attorney. I don't know if she knows which photographs would qualify and which would not qualify under the legal definition.

ATTORNEY RYAN: I'm just asking for her understanding, which I think we all agree is accurate and correct.

I don't think it's -- I thought it was a useful time to just clarify we're talking about different things here, but I can certainly do it through another witness. I have no problems just going on here.

THE COURT: I think her understanding of it I would have allowed in, but if you wanted me to, I would have cautioned the jury to not draw any conclusion. But if you're not objecting to moving on then I think moving on makes sense.

ATTORNEY RYAN: I'll move on.

THE COURT: And we are planning on closing at 1:00? If you have a logical break point where you want to stop?

ATTORNEY RYAN: I'll pick that in the next five minutes.

THE COURT: Okay.

ATTORNEY GRADY: And to be clear, Your Honor, the Government is not contending those two images constitute child pornography, that's not going to be an issue in this trial for

your sake and Attorney Ryan's.

THE COURT: Thank you, appreciate the clarification.

(The sidebar conference concluded.)

BY ATTORNEY RYAN:

Q. So you understood back when you were originally charged and had a chance to see what you were charged with, that this charge of conspiring to produce child pornography was not the photographs you sent by Facebook, correct?

A. Yes.

Q. And they were based on the photographs that you testified were sent by text, correct?

A. Yes.

Q. Now these photographs, all the photographs were of your at the time three-year-old son, right?

A. Yes, they were.

Q. And these were photos of your three-year-old son engaging in sexual activity, correct?

A. Yes.

Q. Photos of him engaging in sexual activity with you, right?

A. Correct.

Q. The second charge was distributing child pornography, correct?

A. Yes, it was.

Q. And this charge was based on you texting these photographs of you engaging in sexual activity with this three-year-old

child to another person, correct?
A. Yes.
Q. You knew these were two very serious crimes, right?
A. Yes, I do.
Q. You became aware that the crime of distributing child pornography carries a mandatory minimum sentence of five years, correct?
A. Yes, I do.
Q. And the penalty for conspiring to produce child pornography is even more severe, right?
A. Yes, I do.
Q. That crime carries a mandatory minimum of 15 years in federal prison, correct?
A. Yes.
Q. And you understand what a mandatory minimum sentence is, don't you?
A. Yes, I do.
Q. You understand it means if you're convicted of that crime, the judge cannot give you any less time than that mandatory minimum, right?
A. Yes.
Q. Meaning if you were convicted of the charge of distribution of child pornography, the judge would have no choice but to sentence you to at least five years in prison, correct?

A. Correct.
Q. And if you were convicted of conspiring to produce child pornography, the judge would have no choice but to sentence you to at least 15 years in federal prison, correct?
A. Correct.
Q. You also understood that when you get a mandatory minimum sentence you can't be released any earlier of that mandatory minimum amount of time, correct?
A. Yes.
Q. So if you were convicted of conspiracy to commit sexual exploitation of a child, you would have to serve every day of that 15 years, correct?
A. Correct.
Q. You also knew that you could get more than 15 years in prison for that charge, right?
A. Yes.
Q. You were informed of -- that charge you could get a sentence of 30 years in prison.
A. Yes.
Q. So you were facing a minimum of 15 years and all the way up to 30 years in prison for that charge of conspiring to produce child pornography, correct?
A. Correct.
Q. And you were just 24 years old?
A. Yes.

Q. And you were looking at being in prison until you were almost 40 years old, correct?
A. Yes.
Q. And possibly later until you were in your mid-50s, right?
A. Yes.
Q. And as we already talked about, you hated the short period of time you were in jail, correct?
A. Yes.
Q. And now you were facing the possibility of being imprisoned for another 30 years, right?
A. Yes.
Q. You understand that being in jail is bad but being in federal prison as a convicted child sex offender is much worse, isn't it?
A. Yes, it is.
Q. This was a very serious situation for you, wasn't it?
A. Yes.
Q. In addition to being very serious, these were two crimes that you had, in fact, committed, correct?
A. Correct.
Q. And you knew that the Government had the evidence to prove it, right?
A. Yes.

ATTORNEY RYAN: I think this would be a good time to take a lunch recess.

THE COURT: Thank you, Mr. Ryan.

Thank you, members of the jury. We are going to take our lunch recess from 1:00 to 2:00. We will start again promptly at 2:00.

I believe we ordered lunch for you so you will have some lunch provided to you, I don't know what it is. I hope it's good. But we will see you at 2:00.

(The jury exited as 12:57.)

THE COURT: See you all at 2:00.

In the future -- without the whisper tech, I'm not sure how to do an objection very quickly, so I appreciate your one-word objection. In the future, if you can give a one-word response and I'm happy to call you to sidebar. But this probably wasn't needed, and if I communicated with you better I could have moved things along.

ATTORNEY RYAN: While we're on a similar subject, Your Honor, each time I approach the witness would you like me to ask for permission to approach?

THE COURT: You do not need to ask permission.

See you all at 2:00.

(A recess was taken from 12:58 to 2:11 p.m.)

(The jury returned at 2:11 p.m.)

THE COURT: Mr. Ryan, it's your opportunity to resume.

ATTORNEY RYAN: Thank you, Your Honor.

Good afternoon, Ms. Church.

THE WITNESS: Good afternoon.

BY ATTORNEY RYAN:

Q. Right before the lunch break, we concluded by talking about what your initial exposure was to some very harsh penalties.

I want to pick up right now at a time when that exposure changed on April 19, 2023. I think you testified in your direct examination that that was the day you signed that plea agreement. Do you recall that?

A. Yes.

Q. This was an agreement between you and the Government, correct?

A. Yes.

Q. And I'm going to show you a paper copy of the plea agreement.

Now, you recall that Ms. Maynard drew your attention to the first page and a section there entitled "Change of Plea." Do you see that?

A. Yes.

Q. Now, the first paragraph in this section is about something you agreed to do, correct?

A. Yes.

Q. And the second paragraph is something that the Government agreed to do, correct?

A. Yes.

Q. You agreed to plead guilty to distribution of child pornography, correct?
A. Correct.
Q. And the Government agreed not to charge you with production of child pornography; is that right?
A. Yes.
Q. And so the Government agreed not to charge you with a crime that you admit you committed, correct?
A. Correct.
Q. And as a result of this decision, you are no longer facing that 15-year mandatory minimum sentence, correct?
A. Correct.
Q. Or that potential 30-year sentence, correct?
A. Correct.
Q. Now, also on April 19, 2023, I think we talked about the fact that you also entered into a cooperation agreement in addition to the plea agreement, correct?
A. Yes.
Q. And this cooperation agreement required you to cooperate fully with law enforcement agents and Government attorneys, correct?
A. Yes.
Q. And when you signed that cooperation agreement, you agreed to testify, correct?
A. Yes.

Q. You agreed to testify not only at this trial but at a grand jury as well, correct?
A. Yes.
Q. As part of this cooperation agreement, you agreed to postpone your sentencing until after you testified at this trial, correct?
A. Correct.
Q. Do you know when the date is -- you're scheduled to be sentenced for the crime you pled guilty to?
A. I'm not 100 percent sure.
Q. Some time later in the fall?
A. I believe so, yes.
Q. According to the cooperation agreement, if you provide substantial assistance in the prosecution of Mr. Ubeda, you may receive a substantial benefit, correct?
A. Correct.
Q. If you provide substantial assistance in Mr. Ubeda's case, the Government can file a motion in your criminal case, correct?
A. Correct.
Q. The Government can file the motion in your criminal case that would allow the judge to ignore the five-year mandatory minimum sentence that you are currently facing, having pled guilty to distribution of child pornography, correct?
A. Correct.

Q. If the Government doesn't file this motion, the judge has no choice, right?
A. Correct.
Q. He or she has to give you a sentence that is not less than five years, correct?
A. Correct.
Q. So when Ms. Maynard said earlier that sentencing is up to a judge not the prosecution, that's true in a sense, right?
A. Yes.
Q. The judge gets to impose the sentence, right?
A. Yes.
Q. But the choice of sentences for a judge depend on what the prosecution does or doesn't do with respect to that substantial assistance motion, right?
A. Yes.
Q. Now, you are really hoping the Government files this motion, right?
A. Yes.
Q. You really don't want to go back to jail, correct?
A. Correct.
Q. And if you do end up having to go back to jail, you certainly don't want to spend a full five years there, correct?
A. Correct.
Q. Now, according to the cooperation agreement, the U.S. Attorney gets to decide whether or not you've provided

substantial assistance or not, right?
A. Yes.
Q. And it's up to the U.S. Attorney's Office to decide, in their sole discretion, whether to file the motion to get you out from underneath this five year mandatory minimum sentence you're facing, right?
A. Yes.
Q. Now, on April 27, 2023, eight days after you signed the plea agreement and cooperation agreement, you testified at the grand jury, didn't you?
A. Yes, I did.
Q. The United States Attorney who asked you questions that day was a man named Michael Mazur; is that right?
A. I don't -- I'm not 100 percent sure.
Q. Okay.
Showing you a copy of the grand jury minutes there just on the very first page. Do you see your name there as a witness?
A. Yes, I do.
Q. And do you see the appearance, who is there as the appearance for the United States?
A. Yes.
Q. And is that Michael Mazur?
A. Yes.
Q. So he is the one -- just so we're clear, April 27, 2023, that was the date that you testified at the grand jury?

A. Yes.
Q. Okay. I'm going to let you keep this for just a second here in case you need to refer to it.
Now, if you could turn to page 5 of the grand jury minutes. If you can take a look at -- starting at line 3, I'll ask you questions about line 3 to 6. You basically, at the start of your testimony that day, you admitted that the result --
ATTORNEY MAYNARD: Objection, Your Honor.
Just at this point she hasn't had any lack of memory.
ATTORNEY RYAN: That's fine.
THE COURT: If you could rephrase, Mr. Ryan.
ATTORNEY RYAN: Yes.
BY ATTORNEY RYAN:
Q. When you testified in front of the grand jury back on April 7, 2023, do you recall stating that you hoped you'd get consideration in the sentence recommendation from the U.S. Attorney's Office?
A. Yes.
Q. And that was true in 2023, wasn't it?
A. Yes.
Q. And it's true today, right?
A. Yes.
Q. You're hoping when this case against Bairon Ubeda is over, the U.S. Attorney's Office will file that substantial

assistance motion we talked about, right?
A. Yes.
Q. Now, on May 24 of 2023, you returned to this court, correct?
A. Yes.
Q. That was the day that you actually pled guilty to that charge of distribution of child pornography, right?
A. Yes.
Q. And now when you were first released from custody in this case back in March of 2020, you testified you returned to North Carolina, right?
A. Yes, I did.
Q. And you had some original conditions of release when you left for North Carolina, correct?
A. Yes.
Q. One of those conditions was that you had to have this ankle bracelet monitoring you 24/7, right?
A. Yes.
Q. And on top of that, you had a curfew as well, correct?
A. Correct.
Q. And that curfew required you to -- severely restricted where you could go, correct?
A. Correct.
Q. You had to remain in North Carolina, correct?
A. Uh-huh.

Q. And you had a curfew, too, correct?
A. Correct.
Q. And you basically couldn't leave your home unless it was to go to work at that fast food restaurant where you were employed, correct?
A. Correct.
Q. Now, by the time you pled guilty on May 24, 2023, you had relocated to Hartford, Connecticut, correct?
A. Correct.
Q. And once you pled guilty to this crime, you were not taken into custody, correct?
A. Correct.
Q. In fact, you were allowed to stop wearing this ankle bracelet at that point, correct?
A. No.
Q. Now, you testified a moment ago you don't recall whether you got the ankle bracelet removed that day or not?
A. No, I don't.
Q. I'm going to show you something and I'm going to ask you to read it to yourself?
A. Okay.
Q. I'm not going to ask you to repeat what's there, but when you're done reading it, I'm going to ask you if what I've shown you helps refresh your recollection as to whether or not your ankle bracelet was removed on May 24 of 2023, okay?

A. Okay.
Q. Now, having reviewed that, do you now have a recollection as to whether or not your ankle bracelet was removed on May 24, 2023?
A. Yes.
Q. And was it removed on that day that you pled guilty?
A. Yes.
Q. Now, after you agreed to cooperate in Mr. Ubeda's prosecution, you had some other restrictions on your movement relaxed as well, correct?
A. Yes.
Q. Last December, the prosecution agreed to consent to let you spend Christmas Eve in New York with your fiance, correct?
A. Correct.
Q. And last month, you were allowed to return to New York City again, correct?
A. Correct.
Q. This was for a family trip?
A. Yes, it was.
Q. Right before your birthday?
A. Yes.
Q. And you got to go see places like the Statue of Liberty?
A. Yes.
Q. And Little Italy?
A. Yes.

Q. Chinatown?
A. Yes.
Q. That was a nice trip?
A. Yes.
Q. You were allowed to go on these nice trips because the U.S. Attorney's Office had agreed to not fight about it, right?
A. Correct.
Q. You understand that they let you go on these nice trips because they're happy with your performance for them so far, correct?
A. Correct.
Q. And you believe if they continue to be happy with your performance here at this trial, they'll file that motion to get you out from underneath that five year mandatory minimum sentence in this case, correct?
A. Correct.
Q. You believe that if they're happy with your performance at this trial, maybe you won't have to go back to jail at all, right?
A. Correct.
Q. Now, I want to talk about the child pornography that you produced and distributed. Earlier today, you were shown a Facebook Messenger exchange, correct?
A. Yes.
Q. And this was a Facebook Messenger exchange with the user

of an account in the name of Sandra Vazquez, right?
A. Yes.
Q. And during this Facebook exchange, the user of the Sandra Vazquez account -- you were asked to provide certain information, correct?
A. Yes.
ATTORNEY RYAN: And Ms. Minster, if you could show what has previous by been marked as Exhibit 1-2, I believe.
And if we could go to the business -- Facebook business record page 14010. And just the bottom there.
BY ATTORNEY RYAN:
Q. These were the things that you were asked to provide to the Sandra Vazquez account, correct?
A. Yes.
Q. And if we go to -- the very bottom, the first thing that you did was you provided your full legal name, your birthday, and if we go to the next page you then provided all the other information that had been asked of you, correct?
A. Correct.
Q. And all that information was accurate and correct?
A. Correct.
Q. Including the phone number that you provided, correct?
A. Correct.
ATTORNEY RYAN: Thank you, Ms. Minster. I don't have any --

BY ATTORNEY RYAN:

Q. Now, earlier when you testified about this Facebook exchange with Sandra Vazquez, you were asked some questions about some passages where you described a telephone conversation that you had with the so-called boss, right?

A. Yes.

Q. And you said that this conversation went good, correct?

A. Yes.

Q. You said that he liked that you weren't shy on the phone, correct?

A. Correct.

Q. That he liked that you were talkative, correct?

A. Correct.

Q. That he liked how you answered questions, correct?

A. Correct.

Q. The man that you talked to on the phone that day didn't pressure you to do anything, correct?

A. No.

Q. He didn't make any threats, correct?

A. No.

Q. He seemed like he was interested in working with you in the adult entertainment business, correct?

A. Correct.

Q. This conversation was so unremarkable you actually forgot that you had it, didn't you?

A. I don't --
Q. Well, let me ask you this: Back on May 7 of 2005, do you recall meeting with Mr. Grady and Ms. Maynard?
A. I believe so, yes.
Q. And do you recall there was a Homeland Security agent there as well by the name of Tara Kelleher?
A. Yes.
Q. And your attorney was there as well?
A. Yes.
Q. During that meeting, your said that you didn't recall speaking to anyone on the phone, didn't you?
A. Yes.
Q. Now, you did not end up using Facebook Messenger to distribute the child pornography that you produced, correct?
A. Correct.
Q. You distributed this child pornography through texts, right?
A. Correct.
Q. These were texts that you sent from your phone, correct?
A. Correct.
Q. And they were sent to another phone number, correct?
A. Correct.
Q. Now, by the time law enforcement contacted you, you'd gotten rid of this phone that you used to produce and distribute child pornography, correct?

A. I had a different phone.
Q. So the phone that you had used to distribute the child pornography and create the child pornography, you had gotten rid of that phone, correct?
A. I had it in my care but I didn't use it.
Q. Did you give it to law enforcement?
A. Yes, they did take it.
Q. They took the phone that you had that had all these texts that you received and that you sent with child pornography on them?
A. Yes.
Q. Okay. So I guess I'm a little confused.
Since this happened, has anybody shown you these copies of these texts that you received or that you sent with the child pornography?
A. No.
Q. So you gave -- you volunteered this phone that had this evidence in it of you distributing child pornography and you haven't been, in the course of these many years ever seen -- been asked to look at any of those texts that you sent or received?
A. No.
Q. Now, in addition to taking photographs of you engaging in sexual activity with your son, you took photographs of things like his birth certificate and social security card, correct?

A. Yes.
Q. And I'm going to show you -- I think it was previously shown to you as Government Exhibit 3.
ATTORNEY RYAN: And if I could take a turn with the --
THE CLERK: It's not working.
ATTORNEY RYAN: Okay.
BY ATTORNEY RYAN:
Q. I'm going to show you what is Government Exhibit 3 and make sure we're on the same page there. That's the picture that you took of those documents?
A. Yes.
Q. Along with a letter related to your son's medical condition?
A. Yes.
Q. Now, this was a photograph that you took before you took the photographs containing the child pornography, correct?
A. Yes.
Q. And prior to this trial -- I think you testified a minute ago that while you turned over the phone that had all this child pornography and text messages on it, you've never seen any of those -- that evidence that you volunteered in the case, correct?
A. No.
Q. The evidence of child pornography you looked at were those nine photographs that the jury saw earlier today, correct?

A. Yes.
Q. And you produced these nine photographs over five years ago, correct?
A. Yes.
Q. And because nobody from the Government has given you access to this phone and reviewed what's on that phone, we can't be sure that those nine photographs are the only evidence of child pornography on that phone, correct?
A. Correct.
Q. You may well have taken other pictures or other videos that we just haven't seen, correct?
A. Correct.
Q. What we have is limited to what somebody else received and chose to save, correct?
A. Correct.
Q. And I can tell you're struggling with that little feedback just as I am. I'm not quite sure where that's coming from.
Do you have any theories, Your Honor?
THE COURT: I don't. Ms. Beatty, were you able to do anything about that -- that little feedback we keep getting.
ATTORNEY RYAN: I'm happy to stand closer or further from the mic.
THE COURT: I don't know which would help. Maybe your commenting on it solved the problem.
ATTORNEY RYAN: Lets go with that.

BY ATTORNEY RYAN:
Q. So earlier today, Ms. Church, you were asked some questions about why you took these pictures of yourself engaging in sexual activity with your son. Do you recall that?
A. Yes.
Q. You testified that either Sandra Vazquez or the boss said -- sent you texts asking for pictures of your son naked and touching parts of you. Do you recall that testimony?
A. Yes.
Q. I think you then went onto say that the boss said that if you didn't do it, they'd take your son from you. Is that the testimony that you gave earlier?
A. Yes, it was.
Q. Now, you took these pictures on or about January 4th of 2019; is that correct?
A. Correct.
Q. And you took these pictures after your Facebook exchange with Sandra Vazquez ended, correct?
A. Yes.
Q. And during this exchange that you were shown today, there were definitely times when she or the person using that account was threatening or pressuring you, correct?
A. Correct.
Q. But we looked at how that whole exchange ended, the very last part of it. You'd agree that the very last thing the user

of that account said in the exchange was, "Can't stand Fridays, LOL. They're like huge migraines for me. Been extremely busy since 5:00 a.m."

Do you recall that being the last message you received?

A. Yes.

Q. And the last thing you said was, "Aww, I'm sorry to hear that, love." Right?

A. Yes.

Q. So at the end of this exchange, the user of the Sandra Vazquez account didn't threaten or pressure you to do anything, correct?

A. Correct.

Q. Now, it's your claim that the boss threatened and pressured you to produce this child pornography with your son, right?

A. Yes.

Q. And your story is that he made these threats and exerted this pressure in text messages, correct?

A. Correct.

Q. Text messages that the Government has that you gave the Government, correct?

ATTORNEY MAYNARD: Objection, Your Honor. That assumes facts not in evidence.

THE COURT: I'll see you at sidebar.

(A conference was held at sidebar.)

ATTORNEY MAYNARD: She testified earlier -- sorry I don't know whether to whisper.

She testified earlier that she handed over phones that she had. There's no evidence that the Government has text messages from those phones and just didn't show them to her.

THE COURT: Mr. Ryan, I think you did establish that she turned the phone over. I don't know that you established that the Government examined the phone.

ATTORNEY RYAN: I think what she testified to is that she gave the Government the phones to law enforcement when she was contacted -- may not have specified which law enforcement. I think we're really in a strange place here that we'll have to figure out how to proceed, because I think it was an undisputed fact Mr. Grady referred to in his opening statement that they do not have these text messages.

ATTORNEY MAYNARD: I guess that's my point. It's not that we have them and aren't showing them. We don't have them. So to say the Government has them and is not showing them --

THE COURT: Are you saying those phones were never turned over to the Government?

ATTORNEY MAYNARD: We don't know. She did at some point, when she turned over, say something about she wiped her phones typically when she would get a new one.

ATTORNEY RYAN: I think we're probably going to have a stipulation eventually that this testimony is just wrong. But

for right now, I'm trying to just figure out how long she's willing to make it because it's just not consistent with any of the discovery.

I'm not suggesting they're holding on to evidence that hasn't been turned over. I think the witness is just either badly mistaken or lying with the phone that she indisputably used.

ATTORNEY MAYNARD: At one point she said she had about ten phones so I think she probably just honestly has no idea.

ATTORNEY RYAN: I'll ask her.

THE COURT: So you can redirect and fix that. I think it's fair for you to reestablish that she turned over the phones that contained these text messages and these pictures and that the Government has never shown them to her.

ATTORNEY RYAN: I'll leave that where we were.

(The sidebar conference concluded.)

BY ATTORNEY RYAN:

Q. So Ms. Church, just so I'm clear here, so it's your testimony that the phone that you used to create and distribute this child pornography was a phone that you turned over to law enforcement; is that correct?

A. Correct.

Q. Do you remember which law enforcement agency you turned it over to?

A. No, I don't remember.

Q. Is it possible that you actually turned over phones but the phones that you turned over you had wiped clean?
A. Yes.
Q. So that the phones didn't actually contain this evidence of texts that you sent and received regarding the child pornography?
A. Correct.
Q. So just so we're clear, you said that you've never been shown these texts that you claimed that you received pressuring you to create this child pornography, right?
A. Yes.
Q. And now I think you're acknowledging it's possible that the reason you were never shown these texts is because you destroyed this evidence, correct?
A. Correct.
Q. Now, you would agree that text messages -- if they existed on your phone -- demanding that you produce and distribute child pornography, this would have been really helpful to you, correct?
A. Correct.
Q. But you sitting here today don't have any of those text messages, correct?
A. Correct.
Q. And that's because nobody sent you text messages demanding that you produce child pornography; isn't that right?

A. I don't understand what you're --
Q. What's that?
A. Can you clarify?
Q. Yeah. So nobody sent you a text demanding that you straddle your three-year-old son and take a picture of it, correct?
A. I was sent a message stating which position and how to position my son and what pictures to take.
Q. A text that you don't have.
A. Correct.
Q. Because you -- it's your testimony that you destroyed it?
A. Yes.
Q. And wiped it clean so that nobody could see this, correct?
A. Correct.
Q. Now, you know the most serious charge Mr. Ubeda is facing is that he participated with you in producing this child pornography, correct?
A. Correct.
Q. This is the most serious charge you face before you started cooperating with the Government, correct?
A. Correct.
Q. If you produced and distributed this child pornography on your own without being told or asked to, you know that Mr. Ubeda couldn't be found guilty of this crime, correct?
A. Correct.

Q. You are testifying here today as part of a cooperation agreement, correct?
A. Correct.
Q. A cooperation agreement that specifically notes that you'll be evaluated based on the value of your testimony, correct?
A. Correct.
Q. You are here today to help the Government, correct?
A. Yes.
Q. You're here today to help the Government convict Mr. Ubeda, right?
A. Yes.
Q. You're hoping that if you help the Government, the Government will continue to help you, correct?
A. Correct.
Q. Agreeing to help the Government is what got you out of jail in the first place, correct?
A. Yes.
Q. Now you want the Government to help you stay out of jail, correct?
A. Yes.
Q. If the Government doesn't give you this help by filing that motion we talked about, you know you're definitely going to be going back to jail, correct?
A. Yes.

Q. You know that you'll be definitely going to federal prison for at least five years, right?
A. Yes.
Q. Your concerned that if the Government doesn't get the help it needs from you to convict Mr. Ubeda, you might not get the help you need from the Government to stay out of prison, correct?
A. Correct.
Q. Now, today you claim that you sent the child pornography to the phone for the boss or the master, correct?
A. Correct.
Q. But that's not what you said when you testified at the grand jury, correct?
A. Correct.
Q. We established you testified at the grand jury on April 27, 2023, correct?
A. Yes.
Q. And prior to testifying that day, you reviewed five of those nine photographs that were offered as exhibits at this trial and were offered as exhibits at the grand jury, correct?
A. Yes.
Q. Each exhibit was a photograph of you engaging in sexual activity with your then three-year-old son, correct?
A. Yes.
Q. And that's then when you testified at the grand jury,

right?
A. Yes.
Q. You took an oath to tell the truth when you testified, right?
A. Yes.
Q. To tell the whole truth and nothing but the truth, right?
A. Yes.
Q. The same oath that you took before testifying today, right?
A. Yes.
Q. And after swearing to tell the truth, you answered questions, correct?
A. Correct.
Q. Questions from Mr. Mazur, the Assistant United States Attorney, correct?
A. Yes.
Q. And you answered those questions under oath before the grand jurors, correct?
A. Yes.

ATTORNEY RYAN: Your Honor, may we be seen briefly at sidebar?

(A conference was held at sidebar.)

ATTORNEY RYAN: I thought it would be prudent to flag this before getting into it.

Essentially, what the testimony was at the grand jury,

Mr. Mazur repeatedly asked her a question, "Did you send that image to the person you believed to be Sandra Vazquez via text message?"

She's testified at this trial that she sent it to the boss. So this is inconsistent testimony and I want to impeach her on that.

THE COURT: Okay.

ATTORNEY RYAN: But I wanted to make sure, doing it here at sidebar, is that this testimony that Mr. Mazur elicited about believing to be Sandra Vazquez, I realize the Court ruled on a motion in limine about I think that this is apples and oranges, but I did not want to open a door by eliciting testimony about her belief. I'm not using it for her belief, I just want to impeach.

So I just wanted to make sure that wasn't the Government's position that this line of inquiry would open a door that the Court closed yesterday in respect to Shamara Resto.

ATTORNEY MAYNARD: I don't think that quite gets there, and I don't think she was in the same position as Shamara Resto.

ATTORNEY RYAN: Okay. That's all I wanted to do. Thank you very much.

(The sidebar conference concluded.)

BY ATTORNEY RYAN:

Q. Now, if I could turn your attention to page 7 of the grand jury minutes.

One of the questions you were asked by Mr. Mazur that day was whether you used Facebook exclusively to communicate with the user of the Sandra Vazquez account, correct?

A. Yes.

Q. And you said, "We communicated through Facebook and via text message," correct?

A. Correct.

Q. As you testified before the grand jury, AUSA Mazur went through each one of those exhibits, those photos of you you engaged in sexual activities with your three-year-old son?

A. Correct.

Q. And as AUSA Mazur showed you each photograph, he asked you the same set of questions.

ATTORNEY RYAN: And if we go up to page 13, I think you'll see what I'm talking about.

BY ATTORNEY RYAN:

Q. The last question in this set of questions that he asked you with respect to these five photographs was, quote, "Did you send that image to the person you believed to be Sandra Vazquez via text message."

That's what he asked?

A. Yes.

Q. And each time to that question you answered yes, correct?

A. Yes.
Q. AUSA Mazur -- if we go to page 15, lines 5 through 7 -- then asked you this question. Quote, "Did you send these images to anybody except the person that you believed to be Sandra Vazquez?"
Is that the question that he asked you?
A. Yes.
Q. And your answer to that question -- again, under oath before that grand jury was what?
A. No.
Q. You did not testify at the grand jury that you sent these photos by text to the boss, correct?
A. Correct.
Q. Or to the master, correct?
A. Correct.
Q. What you said under oath was that you sent them to one person and one person only -- the person you believed that was Sandra Vazquez, correct?
A. Correct.
ATTORNEY RYAN: I don't have any further questions for you, Ms. Church. Thank you.
THE COURT: Ms. Maynard, any redirect?
ATTORNEY MAYNARD: Very briefly, Your Honor.

REDIRECT EXAMINATION

ATTORNEY MAYNARD: Ms. Minster, if you could pull up

Exhibit 1-2 page 224. And if we can look at that message beginning with timestamp 17:00:20 and the two messages below that.

BY ATTORNEY MAYNARD:

Q. Ms. Church, I'm showing you these messages -- and this is January 3rd of 2019. On that top message, what did the Sandra Vazquez account say to you?

A. I did told my boss you went to the hospital.

Q. And looking at that bottom message from Sandra Vazquez, what did the Sandra Vazquez account say?

A. She put, "So he wants you to send in proof that you -- of that immediately."

Q. Based on messages like that, did you believe the Sandra Vazquez account was speaking for the boss?

A. Yes.

ATTORNEY MAYNARD: Ms. Minster, can we go to page 237 of that Exhibit? And if we can go to the message at 17:30:34 and the one right below it. Again, this is January 3, 2019.

BY ATTORNEY MAYNARD:

Q. That is about six and a half years ago, right?

A. Yes.

Q. Can you read what the Sandra Vazquez account says to you here?

A. "One last thing, take a photo with your son grabbing your tits or sucking your tits and looking at the camera."

Q. Ms. Church, who was the first person who suggested you take sexual photos with your son?
A. It was the boss and Sandra -- or --
Q. And you testified earlier that you communicated outside of Facebook with both the person you were introduced to as the boss and the person you believed to be Sandra Vazquez; is that right?
A. Yes.
Q. And Ms. Church, those images we looked at earlier, specifically those nine images that you said that you took and sent via text message --
A. Yes.
Q. -- why did you take those?
A. Because I was threatened to take them, that I was told that if I didn't take the pictures the way they wanted them, that my son would be taken from me.
Q. Ms. Church, if it was not for either the person claiming to be Sandra Vazquez or the person claiming to be the boss threatening you and demanding those photos, would you have taken them?
A. No.

ATTORNEY MAYNARD: No further questions.

THE COURT: Thank you Ms. Maynard.

ATTORNEY RYAN: No recross.

THE COURT: Thank you Mr. Ryan. Ms. Maynard, you may

call your next witness. Ms. Church, you may step down. Thank you.

CERTIFICATE OF OFFICIAL REPORTER

I, Jessica Leonard, Certified Shorthand Reporter and Federal Certified Realtime Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter, to the best of my skill and ability.

Dated this 17th day of February, 2026.

/s/ Jessica M. Leonard

Jessica M. Leonard, CSR, FCRR

Official Court Reporter